## The NETWORK PROJECT et al., Appellants,

v.

## CORPORATION FOR PUBLIC BROADCASTING, a corporation, et al.

### No. 75–1963.

United States Court of Appeals, District of Columbia Circuit.

Argued June 8, 1976.
Decided July 22, 1977.

Theodore D. Frank, Washington, D. C., with whom Eric H. Smith, Harry M. Plotkin and Ronald A. Cass, Washington, D. C., were on the brief, for appellee Public Broadcasting Services.

Neil H. Koslowe, Atty., Dept. of Justice, Washington, D. C., with whom Rex E. Lee, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., and Leonard Schaitman, Atty., Dept. of Justice, Washington, D. C., were on the brief, for federal appellee. Thomas S. Moore, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for federal appellee.

James L. McHugh, Jr., Washington, D. C., with whom Randolph J. May and Robert W. Fleishman, Washington, D. C., were on the brief, for appellee Corporation for Public Broadcasting.

Before ROBINSON and WILKEY, Circuit Judges, and WILLIAM J. JAMESON,[*] United States Senior District Judge for the District of Montana.

Opinion for the Court filed by SPOTTSWOOD W. ROBINSON, III, Circuit Judge.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Appellants are numerous viewers of public television (viewer-appellants)[1] and three individuals who have written, directed and produced public television programs (producer-appellants).[2] Appellees are the Corporation for Public Broadcasting (CPB), established pursuant to congressional authorization as a conduit of federal funds for public television, and the Public Broadcasting Service (PBS), created by CPB to distribute public television programs to local stations, together with Clay T. Whitehead, who as a former presidential aide, was Director of the Office of Telecommunications Policy. The appeal emanates from a judgment of the District Court dismissing an

Oscar Chase, Brooklyn and Leslie A. Blau, New York City, of the bar of the Court of Appeals of New York, pro hac vice by special leave of court, with whom Melvin L. Wulf and Jeremiah S. Gutman, New York City, were on the brief, for appellants.

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

1. Viewer appellants are the Network Project and the American Civil Liberties Union, organizations whose memberships include viewers of public television, and 11 individuals who are viewers also.

2. Producer appellants are Paul Jacobs, Saul Landau and John Kuney.

action precipitated by activities allegedly violative of rights secured by statute and the Constitution.[3]

In their complaint, appellants charge that appellees have censored and controlled the content of public television in contravention of the First Amendment [4] and legislation known as the Public Broadcasting Act.[5] Specifically, the complaint avers that CPB and PBS have eliminated funding for most or all controversial programs, and now require detailed descriptions of program content as a condition of funding. The complaint further avers that CPB and PBS have prescreened and censored programs, have required program changes prior to distribution, and have issued warnings to local stations about programs considered by them to be controversial. Whitehead and Patrick J. Buchanan, another former presidential aide once a party,[6] are accused of attempts to cause CPB and PBS to remove all controversial programs from the air.

Viewer-appellants seek declaratory and injunctive relief prohibiting appellees from interfering with their asserted right to see uncensored public television programs. Producer-appellants demand damages for injury to their professional reputations and their ability to market their work products allegedly resulting from censorship of programs written, directed or produced by them. The District Court first dismissed the suit against the individual defendants as moot.[7] The court then held that appellants had failed to state a claim under the Public Broadcasting Act upon which relief could be granted.[8] Lastly, it dismissed the First Amendment contentions of viewer-appellants for lack of jurisdiction [9] and those of producer-appellants for lack of substantive merit.[10] We reverse the disposition of the First Amendment claims as to both viewer- and producer-appellants. In all other respects, we affirm.

I

The District Court held that insofar as the action sought declaratory and injunctive relief from Whitehead and Buchanan, the presidential aides, it had become moot because of their resignations from office after commencement of suit.[11] Appellants pursue this appeal only against Whitehead, formerly the Director of the Office of Telecommunications Policy.[12] They argue that they should now be allowed to proceed against Whitehead's successor.

■ While Federal Civil Rule 25(d)(1) provides for automatic substitution of a successor,[13] and eliminates the requirement that the plaintiff demonstrate need for continuing the action upon substitution,[14] it will not keep alive an otherwise moot controversy. This principle was firmly established by the Supreme Court's decision in *Spomer v. Littleton.*[15] There, residents of

3. *Network Project v. Corporation for Pub. Broadcasting*, 398 F.Supp. 1332 (D.D.C.1975).

4. U.S.Const. amend. I.

5. Act of Nov. 7, 1967, Pub.L.No.90–129, tit. II, § 201, 81 Stat. 368, as amended, 47 U.S.C. §§ 396 *et seq.* (Supp. V 1975), hereinafter cited as codified.

6. Buchanan was a special consultant to the President. Though a defendant in the District Court, he is not a party here. See text *infra* following note 10.

7. *Network Project v. Corporation for Pub. Broadcasting, supra* note 3, 398 F.Supp. at 1335–1337.

8. *Id.* at 1337–1339.

9. *Id.* at 1339–1342.

10. *Id.* at 1341 n. 13.

11. *Id.* at 1335.

12. See Reorganization Plan No. 1 of 1970, 3 C.F.R. 1066 (1971).

13. Fed.R.Civ.P. 25(d)(1) provides in relevant part that "[w]hen a public officer is a party to an action in his official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and his successor is automatically substituted as a party."

14. 3B J. Moore, Federal Practice ⸢ 25.09[3] at 25–401 (2d ed. 1974).

15. 414 U.S. 514, 94 S.Ct. 685, 38 L.Ed.2d 694 (1974).

Cairo, Illinois, filed suit against Peyton Berbling, State's Attorney for Alexander County, charging him with a variety of racially discriminatory law enforcement practices. After the Seventh Circuit announced its decision on appeal, Spomer was elected to succeed Berbling. Relying on Supreme Court Rule 48(3),[16] Spomer then petitioned for certiorari to challenge the Court of Appeal's approval of the possibility of injunctive relief against the State's Attorney. The plaintiffs did not oppose this substitution, and the Supreme Court granted the writ.

After plenary review, however, the Court found nothing in the record upon which to base a conclusion that a concrete controversy between the residents of Cairo and the State's Attorney still existed.[17] Of primary importance here, the Court emphasized that "[t]he wrongful conduct charged in the complaint is personal to Berbling, despite the fact that he was also sued in his then capacity as State's Attorney,"[18] and that "[n]o charge is made in the complaint that the policy of the office of State's Attorney is to follow the intentional practices alleged . . . ."[19] The Court further noted that the plaintiffs made no allegation that Spomer intended to continue the practices of which they complained.[20]

At oral argument, counsel for the State's Attorney had indicated that Spomer did not intend to deviate from the practices of his predecessor.[21] The Court, however, held that "to determine whether respondents have a live controversy, . . . we must look to the charges *they* press."[22] Having found that there was a strong possibility of mootness, the Court remanded the case for a determination as to whether it was moot and whether the plaintiffs desired, and should be permitted, to amend their complaint to include claims for relief against Spomer.[23]

▪ The similarities between *Spomer* and the instant case are obvious and for appellants insurmountable. Here, as in *Spomer,* the wrongful conduct charged is personal to the named defendant, despite his having been sued in his official capacity.[24] Like the plaintiffs in *Spomer,* appellants here have not averred that it is departmental policy to follow the practices charged. Moreover, appellants have rejected an opportunity to amend their complaint to add allegations that the asserted conduct has continued beyond Whitehead's departure.

---

**16.** That rule, which is virtually identical to Fed. R.Civ.P. 25(d)(1), provides that "[w]hen a public officer is a party to a proceeding here in his official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and his successor is automatically substituted as a party."

**17.** *Spomer v. Littleton, supra* note 15, 414 U.S. at 520–522, 94 S.Ct. at 688–690, 38 L.Ed.2d at 699–700.

**18.** *Id.* at 521, 94 S.Ct. at 689, 38 L.Ed.2d at 700.

**19.** *Id.*

**20.** *Id.* at 521–522, 94 S.Ct. at 689, 38 L.Ed.2d at 699–700.

**21.** *Id.* at 522 n. 10, 94 S.Ct. 689 n. 10, 38 L.Ed.2d at 700 n. 10.

**22.** *Id.* (emphasis in original).

**23.** *Id.* at 522, 94 S.Ct. at 689–690, 38 L.Ed.2d at 700–701. On remand, the plaintiffs informed the Court of Appeals that they did not intend to name Spomer as an additional defendant because they were unable to allege that he was continuing the discriminatory practices of his predecessor. Accordingly, the court dismissed the complaint against Berbling as moot. *Littleton v. Berbling,* No. 71–1395 (7th Cir. Jan. 29, 1975) (unreported).

**24.** The complaint charged, *inter alia,* that Whitehead pressured CPB officers to discontinue various controversial programs and to reduce live news coverage. Joint Appendix (J.App.) 19. Appellants' argument that they did not explicitly characterize the conduct of which they complain as personal to Whitehead is beside the point. They did assert that Whitehead committed certain discrete illegal acts, and in the absence of any allegation that the acts were other than individual—*i. e.,* departmental policy—their complaint can be construed only as charging personal misconduct.

On the basis of the complaint,[25] then, we are unable to say that a live controversy now subsists between appellants and the Director of the Office of Telecommunications. Accordingly, we affirm the District Court's dismissal of the suit in that regard.

## II

Next to be considered is whether the District Court possessed jurisdiction of appellants' statutory and constitutional claims. Jurisdiction was invoked on three separate grounds, all of which were deemed unacceptable. The court declined to exercise federal-question jurisdiction under 28 U.S.C. § 1331,[26] holding that appellants had failed to establish that the requisite $10,000 was in controversy.[27] The court also held that jurisdiction could not be predicated upon 28 U.S.C. § 1361.[28] That provision, which imparts jurisdiction over suits "to compel . . . any agency . . . to perform a duty owed to the plaintiff,"[29] was held inapplicable on the ground that

CPB is not an agency, and CPB's directors are not officers, within its contemplation.[30] Finally, without deciding whether it had jurisdiction under 28 U.S.C. § 1337,[31] the court held that no right of action could be implied from the Public Broadcasting Act of 1967 and dismissed appellants' statutory claims accordingly.[32] In a brief footnote, the court added that "[i]n that instance there is no pendent jurisdiction under § 1337,"[33] and thereby nipped in the bud appellants' undertaking to demonstrate a constitutional basis for relief.

We think that in reaching this last conclusion, the District Court misconceived the scope of pendent jurisdiction. If the court derived power from Section 1337 to adjudicate appellants' statutory contentions—a matter we find not subject to serious dispute[34]—applicable legal principles required that it also hear appellants' constitutional claims as an exercise of pendent jurisdic-

---

**25.** Appellants suggest that an affidavit which Whitehead submitted to the District Court, J.App. 37–41, shows that the acts complained of represented departmental policy, and thus that a live controversy persists in the absence of a disclaimer by Whitehead's successor. This argument is misconceived. The affidavit does not concede that it was departmental policy to interfere with CPB programming decisions; it simply asserts that the Director of the Office of Telecommunications has statutory responsibilities in matters concerning public broadcasting. In any event, Whitehead's representations are irrelevant since mootness must be determined solely by reference to the allegations of the complaining party. *Spomer v. Littleton, supra* note 15, 414 U.S. at 522, n. 10, 94 S.Ct. at 689 n. 10, 38 L.Ed.2d at 700 n. 10, quoted in text *supra* at note 23.

**26.** "The district courts shall have original jurisdiction in any civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States, except that no such sum or value shall be required in any such action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity," 28 U.S.C. § 1331(a) (1970), as amended by Act of Oct. 21, 1976, Pub.L.No.94–574, § 2, 90 Stat. 2721.

**27.** *Network Project v. Corporation for Pub. Broadcasting, supra* note 3, 398 F.Supp. at 1340–1342.

**28.** *Id.* at 1339.

**29.** "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361 (1970).

**30.** *Network Project v. Corporation for Pub. Broadcasting, supra* note 3, 398 F.Supp. at 1339.

**31.** "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopoly." 28 U.S.C. § 1337 (1970).

**32.** *Network Project v. Corporation for Pub. Broadcasting, supra* note 3, 398 F.Supp. at 1337–1339, 1342.

**33.** *Id.* at 1340 n. 9.

**34.** We discuss this *infra* text at notes 37–49.

tion.[35] We conclude that its failure to do so constituted an abuse of discretion.[36]

Section 1337 confers jurisdiction on district courts in suits "arising under any Act of Congress regulating commerce . . ."[37] This grant has been broadly interpreted to reach any federal statute for which the Commerce Clause[38] furnishes a predicate.[39] In *National Broadcasting Co. v. United States*,[40] the Supreme Court upheld the licensing system established by Congress in the Communications Act of 1934[41] as a proper exertion of its power over interstate commerce.[42] The Communications Act is now fully recognized as an "[a]ct of Congress regulating commerce" within the meaning of Section 1337.[43]

The Public Broadcasting Act originated in the Interstate Commerce Committees of both Houses of Congress, and came into being as an amendment to the Communications Act of 1934.[44] It expressly promotes the establishment and development of non-commercial educational radio and television broadcasting throughout the Nation.[45]

These factors alone bring appellants' statutory claims well within the ambit of Section 1337. Indeed, there is nothing on the face of the statute or discernible in its history to suggest that Congress did not continue reliance upon its commerce power—an obvious facet of legislative authority—in passing the Public Broadcasting Act. Nor can there be the slightest doubt that the commerce power provides Congress with ample authority to foster the development of noncommercial television.[46]

■ For purposes of Section 1337, it is irrelevant that the Public Broadcasting Act might also be upheld as a valid exercise of congressional power to spend for the general welfare.[47] "[T]o found jurisdiction upon § 1337, it is not requisite that the commerce clause be the exclusive source of Federal power; it suffices that it be a significant one."[48] It can hardly be gainsaid that the Commerce Clause, a self-sufficient basis for the Act, is at the very least a significant source of legislative authority for its enact-

---

**35.** We discuss this *infra* text at notes 50–68.

**36.** In light of this disposition, we need not address appellants' other jurisdictional arguments.

**37.** See note 31 *supra*.

**38.** U.S.Const. art. 1, § 8, cl. 3.

**39.** *Cupo v. Community Nat'l Bank & Trust Co.*, 438 F.2d 108, 109–110 (2d Cir. 1971); *Murphy v. Colonial Fed. Savs. & Loan Ass'n*, 388 F.2d 609, 614–615 (2d Cir. 1967); *Imm v. Union R.R.*, 289 F.2d 858, 859–860 (3d Cir.), *cert. denied*, 368 U.S. 833, 82 S.Ct. 55, 7 L.Ed.2d 35 (1961); *Caulfield v. United States Dep't of Agriculture*, 293 F.2d 217, 222 n. 10 (5th Cir.), *cert. dismissed*, 369 U.S. 858, 82 S.Ct. 946, 8 L.Ed.2d 16 (1961).

**40.** 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1934).

**41.** Act of June 19, 1934, ch. 652, 48 Stat. 1064, as amended, 47 U.S.C. §§ 151 *et seq.* (1970).

**42.** *National Broadcasting Co. v. United States, supra* note 40, 319 U.S. at 227, 63 S.Ct. at 1014, 87 L.Ed. at 1368.

**43.** *Massachusetts Universalist Convention v. Hildreth & Rogers Co.*, 183 F.2d 497, 499 (1st Cir. 1950); *Pugach v. Dollinger*, 277 F.2d 739, 741 (2d Cir. 1960) *aff'd*, 365 U.S. 458, 81 S.Ct. 650, 5 L.Ed.2d 678 (1961); *Springfield Television, Inc. v. City of Springfield*, 428 F.2d 1375,

1378 (8th Cir. 1970); *Weiss v. Los Angeles Broadcasting Co.*, 163 F.2d 313, 314 (9th Cir.), *cert. denied*, 333 U.S. 876, 68 S.Ct. 895, 92 L.Ed. 1152 (1947).

**44.** S.Rep.No.222, 90th Cong., 1st Sess. 1 (1967); H.R.Rep.No.572, 90th Cong., 1st Sess. 1 (1967), U.S.Code Cong. & Admin.News 1967, p. 1772.

**45.** See 47 U.S.C. §§ 396(a), (g) (Supp. V 1975).

**46.** That the Commerce Clause sustains federal legislation promoting the growth of interstate commerce has long since been settled. *E. g., Second Employer's Liability Cases (Mondou v. New York, N. H. & H. R.R.)*, 223 U.S. 1, 47, 32 S.Ct. 169, 173–174, 56 L.Ed. 327, 345 (1912); *County of Mobile v. Kimball*, 102 U.S. 691, 696–697, 26 L.Ed. 238, 239 (1881); *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 564, 19 L.Ed. 999, 1001 (1871).

**47.** "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ." U.S.Const. art. I, § 8, cl. 1.

**48.** *Murphy v. Colonial Fed. Savs. & Loan Ass'n, supra* note 39, 388 F.2d at 615. See also *Davis v. Romney*, 490 F.2d 1360, 1365 (2d Cir. 1974); *Esposito v. Shultz*, 366 F.Supp. 1059, 1061 (N.D.Cal.1973).

ment. We hold that the District Court had jurisdiction to consider whether appellants derived a cause of action from the statute, and we later review the court's decision on that score.[49]

■■ Beyond that, since appellants' constitutional and statutory claims "derive from a common nucleus of operative fact"[50] and are such that appellants "would ordinarily be expected to try them [both] in one judicial proceeding,"[51] the District Court clearly had power to hear the constitutional aspects of their lawsuit as a matter of pendent jurisdiction.[52] While "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right,"[53] discretion is not left to the court's "inclination, but to its judgment; and its judgment is to be guided by sound legal principles."[54] In particular, the exercise of discretion must be responsive to the considerations of judicial economy, convenience and fairness to litigants which underlie and justify the phenomena of pendent jurisdiction.[55]

■ The District Court appears to have rested its refusal to assume pendent jurisdiction on the misconception that pretrial dismissal of the statutory claims necessitated dismissal of the pendent claims as well.[56] 'It is true that when state and federal claims are joined and the federal claims are dismissed before trial, the state claims should ordinarily be dismissed as well.[57] The policies implicated when a pendent claim is one based on state law, however, are inapplicable when, as here, the pendent claims are federal.[58] As the Supreme Court has declared,

> · the rationale of [the rule governing pendent state-law claims] centers upon considerations of comity and the desirability of having a reliable and final determination of the state claim by state courts having more familiarity with the controlling principles and the authority to render a final judgment. These considerations favoring state adjudication are wholly irrelevant when the pendent claim is federal but is itself beyond the jurisdiction of the District Court . . . ."[59]

■ Moreover, there is particularly good reason for retaining a pendent claim when it owes its existence to federal law.[60] Beginning with *UMW v. Gibbs*,[61] the Supreme

---

**49.** In Part III *infra.*

**50.** *UMW v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218, 228 (1966).

**51.** *Id.*

**52.** *Id.* See also *Apton v. Wilson*, 165 U.S.App. D.C. 22, 35, 506 F.2d 83, 96 (1974); *Knuth v. Erie-Crawford Dairy Coop. Ass'n*, 395 F.2d 420, 426–427, (3d Cir. 1968), *on remand*, 326 F.Supp. 48 (W.D.Pa.1971), *aff'd in part and rev'd in part*, 463 F.2d 470 (3d Cir. 1972), *cert. denied*, 410 U.S. 913, 93 S.Ct. 966, 3 L.Ed.2d 278, *on remand*, 58 F.R.D. 646 (W.D.Pa.), *aff'd*, 487 F.2d 1394 (3d Cir. 1973); *Burton v. Waller*, 502 F.2d 1261, 1265 n. 1 (5th Cir. 1974), *cert. denied*, 420 U.S. 964, 95 S.Ct. 1356, 43 L.Ed.2d 442 (1975); *Vanderboom v. Sexton*, 422 F.2d 1233, 1242 (8th Cir.), *cert. denied*, 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970).

Another requirement of pendent jurisdiction is substantiality of the primary claim. *UMW v. Gibbs, supra* note 50, 383 U.S. at 725, 86 S.Ct. at 1138, 16 L.Ed.2d at 228. There can be no question but that appellants' primary claim—that a statutory cause of action should be implied—is not wholly without merit, even though it does not prevail. See Part III *infra.*

**53.** *UMW v. Gibbs, supra* note 50, 383 U.S. at 726, 86 S.Ct. at 1139, 16 L.Ed.2d at 228.

**54.** *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 416, 95 S.Ct. 2362, 2371, 45 L.Ed.2d 280, 296 (1975), quoting *United States v. Burr*, 25 F.Cas., No.14,692d, pp. 30, 35 (Cir. Ct. Va. 1807) (No. 14) (Marshall, C. J.).

**55.** *UMW v. Gibbs, supra* note 50, 383 U.S. at 726, 86 S.Ct. at 1139, 16 L.Ed.2d at 228.

**56.** *Network Project v. Corporation for Pub. Broadcasting, supra* note 3, 398 F.Supp. at 1340 & n. 9.

**57.** *UMW v. Gibbs, supra* note 50, 383 U.S. at 726, 86 S.Ct. at 1139, 16 L.Ed.2d at 228.

**58.** *Hagans v. Lavine*, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974).

**59.** *Id.* at 548, 94 S.Ct. at 1385, 29 L.Ed.2d at 594 (footnote omitted).

**60.** 13 C. Wright, A. Miller & E. Cooper, Federal Practice § 3567 at 454 (1975).

**61.** *Supra* note 50.

Court has recognized the special competence of federal courts to adjudicate claims implicating federal policy as a strong basis for exercising pendent jurisdiction. There the doctrine of preemption limited the permissible scope of the state claim, and the Court noted that "federal courts are particularly appropriate bodies for application of pre-emption principles." [62]

Similarly, in *Rosado v. Wyman* [63] a Supremacy Clause [64] claim not otherwise within the court's jurisdiction was joined with a constitutional claim independently cognizable. In upholding a district court's exertion of pendent jurisdiction, even after the constitutional claim had been dismissed as moot, the Court observed that the statutory question was one of federal policy and the argument for the exercise of pendent jurisdiction was therefore particularly strong. [65]

Likewise, in *Hagans v. Lavine*, [66] the Court approved an assumption of pendent jurisdiction over a Supremacy Clause claim in a situation where the constitutional claim, though not insubstantial in a jurisdictional sense, was likely without merit. In so doing, the Court again relied in large measure on the special capability of federal courts to adjudicate federal claims. [67]

■ Our review of applicable Supreme Court precedents thus reveals that the District Court's decision was unresponsive to the considerations that govern the exercise of pendent jurisdiction when the pendent claim invokes federal law. In particular, the District Court should have determined whether, with the statutory claim no longer in the case, considerations of judicial economy, convenience and fairness to litigants called for remittal of the federal constitutional claims to the state courts. We do not suggest that a federal court must automatically or necessarily assume jurisdiction of every pendent federal claim. On the contrary, pendent jurisdiction remains "a doctrine of discretion, not of plaintiffs' right." [68] We do say, however, that involvement of federal law in a pendent claim is a factor significantly affecting the proper exercise of that discretion. As Mr. Justice Douglas noted in *Rosado v. Wyman*, "[when] the claim involved . . . is one of federal law, the reasons for the exercise of pendent jurisdiction are especially weighty, and exceptional circumstances [are] required to prevent the exercise." [69] Since we perceive nothing out of the ordinary that would justify a refusal of pendent jurisdiction here, we hold that the District Court erred in dismissing appellants' constitutional claims. [70] Our judgment according-

---

**62.** *UMW v. Gibbs, supra* note 50, 383 U.S. at 729, 86 S.Ct. at 1140, 16 L.Ed.2d at 230.

**63.** 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970).

**64.** U.S.Const. art. VI, cl. 2.

**65.** *Rosado v. Wyman, supra,* note 63, 397 U.S. at 404, 90 S.Ct. at 1214, 25 L.Ed.2d at 451. Rejecting the argument that loss of power over the primary claim because of mootness foreclosed consideration of the pendent claim, the Court also noted:

> We are not willing to defeat the common-sense policy of pendent jurisdiction—the conservation of judicial energy and the avoidance of multiplicity of litigation—by a conceptual approach that would require jurisdiction over the primary claim at all stages as a prerequisite to resolution of the pendent claim.

*Id.* at 405, 90 S.Ct. at 1214, 25 L.Ed.2d at 451 (footnote omitted). This policy of avoiding piecemeal litigation is equally viable whether the jurisdiction-conferring claim is dismissed on grounds of mootness as in *Rosado* or for failure to state a claim as in the instant case. Like the mooting of a claim, a dismissal under Fed.R.Civ.P. 12(b)(6) might not occur "until after substantial time and energy have been expended looking toward resolution of [the] dispute . . . ." *Id.* at 404, 90 S.Ct. at 1214, 25 L.Ed.2d at 451.

**66.** *Supra* note 58.

**67.** *Hagans v. Lavine, supra* note 58, 415 U.S. at 548 & n. 14, 94 S.Ct. at 1385 & n. 14, 39 L.Ed.2d at 594–595 & n. 14.

**68.** *UMW v. Gibbs, supra* note 50, 383 U.S. at 726, 86 S.Ct. at 1139, 16 L.Ed.2d at 228.

**69.** 397 U.S. at 425, 90 S.Ct. at 1224, 25 L.Ed.2d at 463 (concurring opinion).

**70.** Prior to *Hagans v. Lavine, supra* note 58, it might have been argued that pendent jurisdiction could properly be disclaimed in light of a legislative policy expressed in 28 U.S.C. § 1331(a) (1970) that some constitutional

ly will provide for a remand of those claims for disposition on the merits.[71]

## III

Viewer appellants maintain that they are entitled to injunctive relief against the CPB for violation of various provisions of the Public Broadcasting Act of 1967. Since the Act does not explicitly authorize suits to enforce its provisions, any cause of action that appellants may have must be implied. The District Court noted that the Act undoubtedly was intended to benefit viewers of public television.[72] Nonetheless, the court held that implication of a right of action would seriously impede attainment of the Act's purpose and would inevitably enmesh the courts in supervision of CPB's day-to-day operations.[73] We too conclude that a right of action should not be inferred, but for reasons different from those articulated by the District Court.

To begin with, "the inference of . . . a private cause of action not otherwise authorized by the statute must be consistent with the evident legislative intent and, of course, with the effectuation of the purposes intended to be served by the Act."[74] Furthermore, judicial implication of rights of action should be approached with great care "lest a carefully erected legislative scheme—often the result of a delicate balance of Federal and state, public and private interests—be skewed by the courts, albeit inadvertently."[75] Thus, "[w]hen a court fairly perceives how the legislature accomplished a resolution of the balance of forces, including compromise and concession, the court must abide the result without using its own scales to weigh the strength of the component vectors."[76] With these concerns in mind, we turn to the Public Broadcasting Act to determine whether implication of a right of action is "consistent with the evident legislative intent."[77]

claims below a minimum dollar amount should be left to state courts. See *id.* 415 U.S. at 559, 94 S.Ct. at 1390, 39 L.Ed.2d at 600 (Rehnquist, J., dissenting). This policy, however, was implicitly rejected by the *Hagans* majority as a persuasive ground for declining jurisdiction. *Id.* at 548, 94 S.Ct. at 1385, 39 L.Ed.2d at 594. Moreover, Congress has recently revised § 1331(a) to eliminate the $10,000 amount in controversy requirement in civil actions brought "against the United States, any agency thereof, or any officer or employee thereof in his official capacity." See note 26 *supra.* Without deciding whether the revision applies to this case, we think it clearly reflects a congressional view that federal claimants suing federal defendants should have access to federal courts regardless of the monetary value of their claims. Thus, any colorable basis for leaving the instant constitutional claims to state courts is further undercut.

PBS suggests that since assumption of pendent jurisdiction will result in decision rather than avoidance of a constitutional question, pendent jurisdiction should be refused. Brief for Appellee PBS at 29 n. 20. While the policy of avoiding difficult constitutional questions is undoubtedly a strong one, *Hagans v. Lavine, supra* note 58, 415 U.S. at 546–547 & n. 12, 94 S.Ct. at 1383–1384 & n. 12, 39 L.Ed.2d at 593–594 & n. 12, declining jurisdiction here will not eliminate the necessity of a constitutional decision, but will simply leave its disposition to state courts. As we have shown, there is no

policy favoring state court adjudication of federal claims.

71. Whether a right of action is to be inferred from the Constitution is normally a question on the merits rather than one of jurisdiction. *Bell v. Hood*, 327 U.S. 678, 681–685, 66 S.Ct. 773, 775–777, 90 L.Ed. 939, 942–945 (1946); *Cardinale v. Washington Technical Inst.*, 163 U.S. App.D.C. 123, 127–128, 500 F.2d 791, 795–796 (1974). See also *Apton v. Wilson, supra* note 52, 165 U.S.App.D.C. at 35 & n. 16, 506 F.2d at 96 & n. 16. The District Court has not yet addressed appellants' constitutional claim on that basis, see *Network Project v. Corporation for Pub. Broadcasting, supra* note 3, 398 F.Supp. at 1340 & n. 9, 1342, hence the remand. Of course, we intimate no view as to how the question should be decided.

72. *Network Project v. Corporation for Pub. Broadcasting, supra* note 3, 398 F.Supp. at 1338.

73. *Id.* at 1338–1339.

74. *National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers*, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646, 651–652 (1974).

75. *Holloway v. Bristol Meyers Corp.*, 158 U.S. App.D.C. 207, 210, 485 F.2d 986, 989 (1973).

76. *Id.* at 223, 485 F.2d at 1002.

77. See text *infra* at note 80.

In 1952, the Federal Communications Commission (FCC) began to reserve channels for the exclusive use of educational television.[78] Because of the substantial installation costs, the number of noncommercial stations grew slowly.[79] In 1962, the Educational Television Facilities Act[80] responded to this problem by providing matching funds for the construction of noncommercial stations.[81] Despite rapid growth in the number of stations following its passage, however, shortage of funds and difficulty of exchanging programs among the stations forestalled elevation of the caliber of public telecasts.[82]

In 1966, the Carnegie Commission was organized to conduct a study.[83] The Commission concluded that federal financial assistance would be required to provide the resources necessary for development of superior programs.[84] Perceiving a danger in direct governmental involvement in public broadcasting, however, the Commission recommended that a private nonprofit corporation be created to disburse governmental funds.[85] The corporation envisioned by the Commission would support local stations, "yet [would] be restrained from control or the appearance of control over them."[86] And the corporation would not escape the scrutiny that properly follows the appropriation of federal money, but would be insulated from interference with the day-to-day operation of the programming portions of its work.[87]

Congress incorporated many of the Carnegie Commission's suggestions into the Public Broadcasting Act of 1967. The Act authorized creation of the Corporation for Public Broadcasting, "a nonprofit corporation . . . which [would] not be an agency or establishment of the United States Government,"[88] as a funding mechanism for virtually all activities comprising noncommercial broadcasting.[89] Consistently with the expectations of the Commission, Congress conceived CPB as a vehicle for infusing federal money into public broadcasting without the introduction of government direction or control.[90]

In determining whether private resort to the provisions of the Act harmonizes with congressional intent, we do not write on a clean slate. In *Accuracy in Media, Inc. v. FCC*,[91] we considered the contention that FCC had authority to enforce the Act's call on CPB to facilitate programming with "strict adherence to objectivity and balance in all programs or series of programs of a controversial nature."[92] After reviewing the structure of the public broadcasting system, we were of the view that Section 398 of the Public Broadcasting Act expressly barred FCC jurisdiction over CPB.[93] That section specifies that nothing in the Educational Television Facilities Act[94] or the Public Broadcasting Act "shall be deemed . . . to authorize any department, agency, officer, or employee of the United

---

78. See *Sixth Report and Order on Television Allocation*, 41 F.C.C. 148 (1952).

79. S.Rep.No.67, 87th Cong., 1st Sess. 3 (1961).

80. Act of May 1, 1962, Pub.L.No.87–447, tit. III, 76 Stat. 65, as amended, 47 U.S.C. §§ 390 *et seq.* (1970 & Supp. V 1975), hereinafter cited as codified.

81. 47 U.S.C. § 392 (1970).

82. S.Rep.No.222, 90th Cong., 1st Sess. 4 (1967).

83. Carnegie Commission on Educational Television, Public Television: A Program for Action (1967).

84. *Id.* at 68–79.

85. *Id.* at 36–42.

86. *Id.* at 37.

87. *Id.*

88. 47 U.S.C. § 396(b) (Supp. V 1975).

89. *Id.* §§ 396(g)(1), (2) (Supp. V 1975).

90. H.R.Rep.No.572, 90th Cong., 1st Sess. 15 (1967); S.Rep.No.222, 90th Cong., 1st Sess. 4 (1967).

91. 172 U.S.App.D.C. 188, 521 F.2d 288 (1975).

92. 47 U.S.C. § 396(g)(1)(A) (Supp. V 1975).

93. *Accuracy in Media, Inc. v. FCC, supra* note 91, 172 U.S.App.D.C. at 192, 521 F.2d at 292.

94. See text *supra* at notes 80–82.

States to exercise any direction, supervision, or control over educational television or radio broadcasting, or over the Corporation [for Public Broadcasting] or any of its grantees or contractors . . . ." [95] Since any enforcement of the statutory requirement would necessarily entail "supervision" of CPB, we held that the plain words of Section 398 precluded FCC from acting.[96]

■■■ PBS suggests that Section 398 also forecloses implication of a private right of action since entertainment of private suits would necessarily involve the courts in "supervision," and courts, no less than administrative bodies, are governmental "agencies." [97] We reject this sweeping interpretation of the statutory prohibition. The plain purpose of Section 398 is to prevent any governmental body from influencing CPB in a manner calculated to turn it into a governmental spokesman.[98] While Congress manifestly believed that FCC involvement in enforcing the Act's directives would create the very dangers that Section 398 sought to prevent,[99] it is unlikely that it made the same judgment with respect to courts occasionally summoned to resolve specific controversies arising under the Act. We would need more than PBS offers to persuade us that judicial enforcement of the Act's mandates would constitute "supervision" by a governmental "agency" within the meaning of Section 398. This is not to say that the section authorizes judicial action by negative implication, but only that it is neutral with respect to the question.

In *Accuracy in Media*, we did not rely solely on Section 398 for our holding that FCC was without power to monitor CPB's compliance with its statutory obligations. The structure of the Act and its history additionally persuaded us that FCC jurisdiction would be contrary to the "carefully balanced framework designed by Congress for the control of CPB activities." [100] We noted that Congress had erected numerous statutory safeguards against partisan abuses. For one conspicuous example, board membership is limited to no more than eight out of the authorized fifteen from the same political party.[101] As a further check , the Act insists that CPB's accounts be audited annually by an independent accountant,[102] and contemplates audits by the General Accounting Office.[103] Of major importance is Section 396(k), which assures that most of CPB's budget will be derived through the congressional appropriation

**95.** 47 U.S.C. § 398 (1970).

**96.** *Accuracy in Media, Inc. v. FCC, supra* note 91, 172 U.S.App.D.C. at 192, 521 F.2d at 292.

**97.** Brief for Appellee PBS at 24.

**98.** *Accuracy in Media, Inc. v. FCC, supra* note 91, 172 U.S.App.D.C. at 193, n. 17, 521 F.2d at 293 n. 17. There we stated our understanding of § 398 as follows:

Section 398, formerly § 397 was amended by the 1967 Act to include the Corporation and its activities. The original section was enacted as a provision of the Educational Television Facilities Act of 1962. The prohibition of federal interference was included then as a part of an understanding that "the FCC is not to exercise any control of funds under this program". S.Rep.No.67, 87th Cong., 2d Sess., at 9 (1962), U.S.Code Cong. & Admin. News 1962, pp. 1614, 1620. The expansion of the prohibition to apply to the Corporation and its activities is in keeping with the original fear that financial support by the Government could lead to control over speech.

**99.** The Public Broadcasting Act leaves intact FCC regulatory authority over individual noncommercial licensees. *Accuracy in Media, Inc. v. FCC, supra* note 91, 172 U.S.App.D.C. at 196, 521 F.2d at 296. But FCC jurisdiction over CPB, we noted, could enlarge Government control over program content and thereby upset the balance struck in *Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) between the First Amendment rights of broadcast journalists and the interests of the viewing public. *Accuracy in Media, Inc. v. FCC, supra* note 91, 172 U.S.App.D.C. at 196–197, 521 F.2d at 296–297.

**100.** *Id.* at 194, 521 F.2d at 294.

**101.** 47 U.S.C. § 396(c)(1) (Supp. V 1975).

**102.** 47 U.S.C. § 396(*l*)(1)(A) (Supp. V 1975).

**103.** 47 U.S.C. § 396(*l*)(2)(A) (Supp. V 1975).

process.[104] Section 396(i) complements these curbs with the requirement that CPB submit "a comprehensive and detailed report" on its operations and achievements to Congress annually.[105]

In consequence, we concluded that "[t]hrough these statutory requirements and control over the 'pursestrings,' *Congress reserved for itself the oversight responsibility for the Corporation.*"[106] By that statement we clearly implied that the statutory mandates are to be enforced exclusively by Congress. So, as later in our opinion we stated unequivocally, we viewed the provision advanced as the source of a private right of action "as a guide to Congressional oversight policy and as a set of goals to which the Directors of CPB should aspire,"[107] and "not [as] a substantive standard, legally enforcible by agency or courts."[108]

Appellants attempt to minimize the import of *Accuracy in Media* by branding its discussion of congressional oversight as dicta.[109] We think the discussion bore directly on our decision and thus has considerably more precedential value than appellants are willing to acknowledge. But even assuming that it is dicta, without *stare decisis* effect, appellants point to nothing that minimizes its persuasive force. Instead, they rely solely on a single passage from the House committee report on the Public Broadcasting Act as an indication that Congress counted on private litigation to insure CPB compliance with the statutory provisions at issue in this case.[110] That passage states:

> The educational stations must not be permitted to become vehicles for the promotion of one or another political cause,

party, or candidate. It is assumed that the normal checks and balances within our political system will insure that this principle will be constantly safeguarded by interested citizens.[111]

We are wholly unconvinced that by this reference to the role of "interested citizens," Congress evinced an intent to authorize private rights of action. By our reading, it connotes merely that Congress anticipated that citizen participation through the political process would assist Congress in its oversight function. Even if the statement is deemed ambiguous, appellants' interpretation cannot withstand diametrically opposed expressions in the legislative history. Thus the passage of the committee report that directly follows the portion quoted reads:

> In the same manner that the bill strives to insulate the Corporation from governmental control, the bill provides *and the committee intends to see to it* that the local educational broadcasting stations conduct their operations without Corporation interference or control.[112]

Other legislative antecedents of the Act confirm the view expressed in *Accuracy in Media* that Congress reserved for itself exclusive oversight responsibility. Senator Cotton explained:

> If this bill becomes law, . · . . and if, as time goes on, we have occasion to feel that there is a slanting, a bias, or an injustice, we instantly and immediately can do something about it. First, we can make very uncomfortable, and give a very unhappy experience to, the directors of the corporation. Second, we can shut down some of their activities in the Ap-

---

**104.** 47 U.S.C. § 396(k) (Supp. V 1975).

**105.** 47 U.S.C. § 396(i) (Supp. V 1975).

**106.** *Accuracy in Media, Inc. v. FCC, supra* note 91, 172 U.S.App.D.C. at 194, 521 F.2d at 294 (emphasis supplied) (footnote omitted).

**107.** *Id.* at 197, 521 F.2d at 297.

**108.** *Id.*

**109.** Brief for Appellants at 38.

**110.** *Id.* at 28.

**111.** H.R.Rep.No.572, 90th Cong., 1st Sess. 19–20 (1967), U.S.Code Cong. & Admin.News 1967, p. 1810.

**112.** *Id.* at 20, U.S.Code Cong. & Admin.News 1967, p. 1810 (emphasis supplied).

propriations Committee and in the appropriating process of Congress . . .. The Corporation is much more readily accessible . . . to the Congress, if it is desired to correct any injustice or bias which might appear.[113]

Senator Pastore makes this intent equally plain:

[T]he *whole responsibility* here under this law is to the Congress of the United States . . .. We don't have to repeat the appropriation if we feel this is a failure. This is all subject to the scrutiny of the Congress of the United States.[114]

And, lest we forget, the very structure of the Act reinforces the thesis that Congress felt no need for judicial intervention to exact due regard for the Act.[115]

We hold that private rights of action are not part of the machinery devised by Congress for control of CPB's activities. We accordingly affirm the District Court's rejection of appellants' statutory claims. For reasons articulated earlier, however, we think their constitutional claims were properly before the court.[116] To the extent necessary to enable their consideration on the merits, we reverse the judgment appealed from and remand the case for further proceedings consistent with this opinion.

*So ordered.*

---

**113.** 113 Cong.Rec. 13003 (1967).

**114.** *Hearings on S. 1160 Before the Subcomm. on Communications of the Senate Comm. on Commerce,* 90th Cong., 1st Sess. 123 (1967) (emphasis supplied).

**115.** Text *supra* at notes 100–105.

**116.** Text *supra* at notes 50–71.