544 A.2d 1309

Cyril E. SAGAN, in Behalf of REGISTERED VOTERS OF the COMMONWEALTH

v.

PENNSYLVANIA PUBLIC TELEVISION NETWORK, and Robert A. Gleason, Secretary of the Commonwealth, and Legree S. Daniels, Commissioner of Elections, Appellees.

Appeal of Cyril E. SAGAN.

Supreme Court of Pennsylvania.

Argued March 8, 1988.

Decided July 28, 1988.

---

Cyril E. Sagan, Volant, pro se.

Joseph S. Sabadish, Deputy Atty. Gen., Harrisburg, for appellees.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION OF THE COURT

STOUT, Justice.

Cyril E. Sagan, a legally qualified candidate for the United States Senate in the May 20, 1986, Pennsylvania primary election, filed, in the Commonwealth Court of Pennsylvania, a *pro se* "Complaint for Malicious Acts and Malicious Process to Knowingly and Wilfully Deny Plaintiff and Voters of the Commonwealth Their Rights as Set forth Under Pennsylvania Statutes and The Constitutions of Pennsylvania and of the United States of America."[1] He complained of his exclusion from a televised debate of candidates, aired over public television stations, in which two other candidates appeared. Appellant named as defendants the Pennsylvania Public Television Network, Robert A. Gleason, Secretary of the Commonwealth, and Legree S. Daniels, Commissioner of Elections.

Sagan sought injunctive relief[2] and monetary damages.[3] The defendants filed preliminary objections, one of which challenged the jurisdiction of the Commonwealth Court. That court viewed Sagan's complaint as being based on alleged violations of the "equal time"[4] and "fairness" doctrines of section 315 of The Communications Act of

---

1. This Court has exclusive jurisdiction of appeals from final orders of the Commonwealth Court entered in any matter which was originally commenced in that court. 42 Pa.Cons.Stat.Ann. § 723(a) (Purdon 1981 & Supp.1987).

2. The issue of injunctive relief is moot. We decide the case, however, because the issue is of great public importance and is likely to recur. *See Wortex Mills, Inc. v. Textile Workers Union,* 369 Pa. 359, 85 A.2d 851 (1952); *Conway v. Wilburn,* 87 Pa.Commw. 611, 488 A.2d 92 (1985).

3. The "equal opportunities" provision of The Communications Act of 1934, 47 U.S.C. § 315(a) (1982), *see infra,* does not give rise to a cause of action for damages either under common law or under The Communications Act itself. *Daly v. Columbia Broadcasting Sys., Inc.,* 309 F.2d 83 (7th Cir.1962); *Gordon v. National Broadcasting Co.,* 287 F.Supp. 452 (S.D.N.Y.1968); *Crommelin v. Capitol Broadcasting Co.,* 280 Ala. 472, 195 So.2d 524 (1967).

4. "Equal time" is a misnomer. The correct designation is "equal opportunities." There is a distinction between the two concepts. *See The Law of Political Broadcasting and Cablecasting,* 42 Fed.Reg. 36342, 36369–72, 69 F.C.C.2d 2209, 2260–62 (1978).

1934, 47 U.S.C. § 315 (1982), and, in a *per curiam* opinion, sustained the preliminary objection to its jurisdiction and dismissed the complaint. 104 Pa.Commw. 601, 522 A.2d 191 (1987). This appeal followed. We affirm.

In deciding this jurisdictional question, we have reviewed the pertinent legislation: (1) The Communications Act of 1934, 47 U.S.C. §§ 151–610 (1982); and particularly (2) Section 315 of that Act, which popularly is known as the Equal Time Act; (3) Sections 390–399 of The Communications Act, popularly known as the Federal Public Broadcasting Act of 1967, which created the Corporation for Public Broadcasting, a funding mechanism for non-commercial broadcasting; and (4) 1962 Pa.Laws. 329, 71 Pa.Stat.Ann. § 1188.1–.4 (Purdon Supp.1987), which established the Pennsylvania Public Television Network Commission.

The Communications Act of 1934 established the Federal Communications Commission, a federal regulatory agency that controls and licenses commercial and educational broadcasting. Section 315 of that Act is the source of the "equal opportunities" and the "fairness" doctrines.[5] The "equal opportunities" doctrine is set forth in section 315(a) which states, in relevant part, that:

> If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford *equal opportunities* to all other such candidates for that office in the use of such broadcasting station: Provided, That such licensee shall

**5.** The fairness doctrine is not involved in this case. The fairness doctrine deals with controversial public *issues*, whereas the equal opportunities doctrine refers to *persons* (candidates). The fairness doctrine does not require "equal time." Rather, it requires that the broadcaster devote a reasonable amount of time to the discussion of the most important issues in the geographic area, and that if it presents one side of such an issue, it give reasonable opportunity for presenting contrasting views on that issue. *See Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 377, 89 S.Ct. 1794, 1799–80, 23 L.Ed.2d 371 (1969). For a discussion comparing and contrasting the two doctrines, *see The Law of Political Broadcasting and Cablecasting*, 43 Fed.Reg. 36342, 36390–91, 69 F.C.C.2d 2209, 2300–02 (1978).

have no power of censorship over the material broadcast....

47 U.S.C. 315(a) (1982) (emphasis added).

The Act forbids discrimination among candidates insofar as rates, facilities, practices, or services rendered. *Paulsen v. F.C.C.*, 491 F.2d 887 (9th Cir.1974). The Act does not require a station to sell or give a candidate any particular time period. The station must, however, make periods that normally have comparable audiences available to competing candidates upon request.

Rules and regulations that are promulgated under The Communications Act of 1934 establish the method of enforcement of alleged violations of the Act. The Federal Communications Commission periodically has published *Public Notices* containing recommended formal complaint procedures under section 315,[6] as well as procedures for informal requests for Commission action. *See* 47 C.F.R. § 1.41 (1987). Moreover, Congress has specified remedies for violations of the Act. Section 312(a)(7) of The Communications Act provides administrative sanctions for violation of Section 315. It reads:

(a) The Commission may revoke any station license or construction permit ...

(7) for willful or repeated failure to allow reasonable access to or to permit purchase of reasonable amounts of time for the use of a broadcasting station by a legally qualified candidate for Federal elective office on behalf of his candidacy.

---

6.  *See Generally The Law of Political Broadcasting and Cablecasting,* 43 Fed.Reg. 36342, 69 F.C.C.2d 2209 (1978). Section D of this Primer gives instructions on "How to File a Complaint," and subsection (4) instructs that "When the complainant is seeking 'equal opportunity,' he or she should give the dates of prior broadcasts or cable originations, if any, by his or her opponents, the date on which the request for equal opportunities was made to the station or cable operator, and the reasons the station or cable operator gave for refusing the request." *Id.* at 36344, 69 F.C.C.2d at 2213–14. *See also Use of Broadcast Facilities by Candidates for Public Office,* 24 F.C.C.2d 832 (1970); *Use of Broadcast Facilities by Candidates for Public Office,* 3 F.C.C.2d 463 (1966).

47 U.S.C. § 312(a)(7) (1982). In addition to the administrative sanctions, Congress provided that an injured party may apply to the appropriate district court for the enforcement of a Commission order other than for the payment of money. *Id.* § 401.

In conjunction with this legislative scheme, Congress passed The Public Broadcasting Act of 1967, 47 U.S.C. §§ 390–399 (1982), which amended The Communications Act of 1934, and authorized the creation of the Corporation for Public Broadcasting, "a nonprofit corporation ... which will not be an agency or establishment of the United States Government," as a funding mechanism for virtually all activities comprising noncommercial broadcasting. *Id.*[7] In response to the passage of that Act, the Pennsylvania legislature established in 1968 The Television Network Commission as an independent commission "to apply for, receive and distribute Federal funds, State funds and public or private funds from any source whatsoever, and to serve as a coordination agency in connection with those funds which are available through the Federal Public Broadcasting Act of 1967 and other Federal legislation now or hereinafter enacted." 71 Pa.Cons.Stat.Ann. § 1188.3(5) (Purdon Supp.1987) (footnote omitted). It also was empowered "to apply to the the Federal Communications Commission and other Federal agencies for such licenses necessary to operate and maintain such a network." *Id.* § 1188.3(6).

Cases interpreting both the "equal opportunities" and the "fairness" provisions of section 315 agree that federal law is preemptive,[8] that private rights of action are not part of

7. For an exhaustive discussion of the construction and application of the Federal Public Broadcasting Act of 1967, 47 U.S.C. § 390–399 (1982), albeit with respect to controlling content of public television programs, *see* Annotation, *Construction and Application of Public Broadcasting Act of 1967 as amended (47 USCS §§ 396 et seq.) with Respect to Controlling Content of Public Television Programs,* 44 A.L.R. Fed. 350 (1979).

8. The law of preemption is summarized in *Louisiana Pub. Serv. Comm'n v. F.C.C.,* 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986):
    The Supremacy Clause of Art. VI of the Constitution provides Congress with the power to pre-empt state law. Pre-emption occurs

the machinery devised by Congress for control over the activities of the Corporation for Public Broadcasting, and that enforcement of the statute and vindication of the public interest are vested in the Federal Communications Commission. *See Belluso v. Turner Comm. Corp.*, 633 F.2d 393, 396 (5th Cir.1980); *Network Project v. Corporation for Public Broadcasting*, 561 F.2d 963, 972 (D.C.Cir.1977), *cert. denied*, 434 U.S. 1068, 98 S.Ct. 1247, 55 L.Ed.2d 770 (1978); *Ahmad v. Levi*, 414 F.Supp. 597, 603 (E.D.Pa.1976).

*Belluso, supra,* is instructive as to the purpose of The Communications Act, the rules and regulations to achieve that purpose,[9] administrative sanctions, and the role of the courts in enforcement of decisions. There it is written:

> The purpose of the 1934 Act "was to protect the public interest in communications," ... by formulating "a unified and comprehensive regulatory system for the industry...." To achieve these goals, Congress created the Federal Communications Commission and granted it broad regulatory authority. *The Commission was empowered to prescribe rules and regulations* in furtherance of the Act generally, ... and *of Section 315 in*

---

when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, ... when there is outright or actual conflict between federal and state law, ... where compliance with both federal and state law is in effect physically impossible, ... where there is implicit in federal law a barrier to state regulation, ... *where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law,* ... or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. Pre-emption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may preempt state regulation. *Id.* at 368–69, 106 S.Ct. at 1898–99 (citations omitted) (emphasis added). *See also KVUE, Inc. & Austin Broadcasting Corp. v. Moore,* 709 F.2d 922 (5th Cir.1983), *aff'd,* 465 U.S. 1092, 104 S.Ct. 1580, 80 L.Ed.2d 114 (1983).

**9.** "Federal regulations have no less pre-emptive effect than federal statutes." *Capitol Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 699, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580 (1984) (quoting *Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982)).

*particular, ... and to enforce compliance therewith through various administrative sanctions.... The role of the courts was limited to review and enforcement of Commission decisions and orders under an abuse of discretion standard....* Though the Act has been amended on several occasions since 1934, these amendments have in no way diminished either the central role of the Commission in enforcing the Act or its powers thereunder.

633 F.2d at 396 (emphases added). *See also Kennedy for President Comm. v. F.C.C.*, 636 F.2d 432 (D.C.Cir.1980); *Ackerman v. Columbia Broadcating Sys.*, 301 F.Supp. 628 (S.D.N.Y.1969).

■ Congress has legislated comprehensively in the area of political broadcasting. It established the Federal Communications Commission, which has provided that a complainant seeking redress for denial of equal opportunities should complain to that Commission. Congress has provided for administrative sanctions and judicial enforcement of the Commission's orders. Appellant's complaint seeking injunctive relief and damages in the Commonwealth Court, against the Pennsylvania Television Network Commission, the Secretary of the Commonwealth and the Commissioner of Elections for alleged malicious acts and malicious process must fade when viewed in the bright light of this federal legislative plan. It was brought in the wrong forum, against the wrong defendants,[10] and partially sought the wrong relief.

The order of the Commonwealth Court is affirmed.

---

**10.** The Television Network Commission is not a licensee but an independent agency to receive and distribute funds. Section 153(c) of The Communications Act defines a licensee as "the holder of a radio station license granted or continued in force under authority of this Chapter." 47 U.S.C. § 153(c) (1982).