**NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY, Plaintiff,**

**v.**

**PUBLIC UTILITIES COMMISSION OF MAINE, Peter A. Bradford, Chairman, Cheryl Harrington, Commissioner and Ralph H. Gelder, Commissioner, Defendants.**

**Civ. A. No. 83–0166–P.**

United States District Court,
D. Maine.

Sept. 20, 1983.

Ralph I. Lancaster, Everett P. Ingalls, Portland, Me., for plaintiff.

Francis X. Belotti, Atty. Gen., Charles R. Peck, Sp. Asst. Atty. Gen., Utilities Division, Boston, Mass., amicus curiae for Mass.

John E. Ingle, Deputy Assoc. Gen. Counsel, Fed. Comm. Comm., Washington, D.C., amicus curiae for the FCC.

Thomas Wies, Montpelier, Vt., amicus curiae for the Public Service Board of Vermont.

Joseph G. Donahue, Charles F. Dingman, William E. Furber, Maine Public Utilities Commission, Augusta, Me., for defendants.

Richard E. Crowell, Jr., Comm. Counsel, R.I. Public Utilities Comm., Faith A. La-Salle, Asst. Atty. Gen., R.I. Atty. Gen.'s Office, Providence, R.I., amici curiae for the State of R.I. & Providence Plantations.

Charles R. Peck, Asst. Atty. Gen., Dept. of Atty. Gen., Boston, Mass., amicus curiae for Utilities Div., Public Protection Bureau, Commonwealth of Mass.

OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER IN PROCEEDINGS FOR PRELIMINARY AND PERMANENT INJUNCTIONS

CARTER, District Judge.

## I. INTRODUCTION

This is an action seeking declaratory and injunctive relief, pursuant to 47 U.S.C.A. § 401(b) (1962) of the Communications Act of 1934 (the "Act"), see 47 U.S.C.A. § 609 (Supp.1983), to achieve enforcement of a certain order of the Federal Communications Commission. Plaintiff initially sought a temporary restraining order against the Defendant which was denied by Judge Cyr of this Court on June 15, 1983.

A hearing was held on August 15, 1983, on the Plaintiff's claims for a preliminary and permanent injunction, which are consolidated for decision by consent of the parties. The Court has subject-matter jurisdiction under 28 U.S.C.A. § 1337 (Supp.1983). The Plaintiff was represented at the hearing by Robert A. Lewis, Esq., Ralph I. Lancaster, Esq., and Everett P. Ingalls, Esq. The Defendants, the Maine Public Utilities Commission and the individual Commissioners as defendants, were represented by Charles F. Dingman, Esq., Joseph G. Donahue, Esq., and William E. Furber, Esq. of the legal staff of the Maine Public Utilities Commission. The Federal Communications Commission (hereinafter FCC), participated as amicus curiae via a written submission. The Public Service Board of Vermont and the Attorney General of the Commonwealth of Massachusetts also participated as amici by briefs questioning the jurisdiction of this Court and urging dismissal of the case. The Court also granted a motion filed by the State of Rhode Island seeking leave to participate as amicus in the case. As of the date of this opinion and order the Court has received no brief from the State of Rhode Island.

The Court, having reviewed the record and the written submissions of counsel in this matter, finds the facts, states its conclusions of law and orders as follows.

## II. FINDINGS OF FACT

The Defendant, Public Utilities Commission of Maine ("MPUC"), is authorized by the laws of the State of Maine to regulate the intrastate charges, services, facilities and practices of the Plaintiff, New England Telephone and Telegraph Company ("NET"), to the extent that Plaintiff is engaged in the business of providing telephone utility service to the public within the State of Maine. The Defendants, Peter A. Bradford, Cheryl Harrington and Ralph H. Gelder, are the three Commissioners of the Defendant, MPUC.

On July 27, 1982, NET filed with the MPUC tariff revisions as a result of which it sought an increase of approximately $49.8 million in its annual revenues.

NET based its request for a rate increase in part on the FCC's adoption of the Remaining Life Depreciation Method ("RLDM"). The FCC had allowed that method for capital recapture in a rule making proceeding by its Order No. 20188, of December 5, 1980, 83 F.C.C.2d 267 (1980); reconsidered 87 F.C.C.2d 916 (1981). In a second rule making proceeding on the petition of the National Association of Regulatory Utility Commissions ("NARUC"), the FCC determined that Order No. 20188 did not preempt state regulatory agencies from prescribing depreciation rates and methods inconsistent with RLDM. Amendment of Part 31, Uniform System of Accounts for Class A and Class B Telephone Companies, No. 79–105 (April 27, 1982). Prior to the issuance of the MPUC order, however, the FCC held proceedings which resulted in its Order No. 82–542 (hereinafter cited as "Prescription Order") prescribing depreciation methods to be utilized in rate making proceedings before the FCC involving telephone operating companies. In response to an FCC Order of Public Notice, the MPUC

filed comments opposing the adoption of RLDM and rates for telephone utilities. The so-called Prescription Order was released on December 14, 1982, and since no appeal was filed, it has become final.

On January 6, 1983, in separate proceedings on the consolidated petitions of American Telephone & Telegraph Co. ("AT & T") and GTE Service Corp. on behalf of themselves and of associated Bell System operating companies, the FCC again considered the preemption issue. The resultant "Memorandum Opinion and Order," in *Amendment of Part 31, Uniform System of Accounts for Class A and Class B Telephone Companies,* No. 79–105 (Jan. 6, 1983), (hereinafter cited as "Preemption Order") held that RLDM, as set forth in the prior FCC Order of December 14, 1982, preempted all inconsistent methodologies for treatment of depreciation allowances promulgated by state regulatory agencies in the setting of intrastate telephone rates.[1] The Preemption Order is directed to all state regulatory agencies, is entitled an Order, grants the petition for declaratory ruling, and orders that "this order" be published in the *Federal Register* and be "served on" each state regulatory commission. Preemption Order at 1 and 17.

The Preemption Order was published in the *Federal Register* on January 19, 1983. The Defendant, MPUC, admits that it received a copy of the Order from the FCC and had general knowledge of it. Defendant's Responses to Plaintiff's First Request for Admission of Facts, Response No. 23. The MPUC also admits that the Preemption Order is currently the subject of appellate review;[2] that various states and NARUC have sought and received permission to intervene in the appellate proceedings and that the MPUC did not file a petition to intervene in the appellate proceedings. After making some inquiries, the MPUC determined "that no purpose would be served by such intervention,"[3] *id.,* Response No.

---

1. It is worthy of note that the FCC's Prescription Order of December 14, 1982, explicitly reserved decision on the question of the preemptive effect of the depreciation methods set forth therein on the adoption or utilization of depreciation rates and methods by state regulatory bodies in setting rates for intrastate ratemaking purposes. The FCC noted, however, that "the preemptive effect of this Commission's accounting and/or depreciation determination" was before it in *Petition for Reconsideration* filed by AT & T in No. CC79–105, 85 F.C.C.2d 818 (1981), *reconsidered* 89 F.C.C.2d 1094 (1982), and a *Petition for Declaratory Ruling* filed by the General Telephone Company of Ohio. *Prescription of Revised Percentages of Depreciation,* No. 82–542, at 9 (Dec. 14, 1982). The preemptive issue was resolved in the FCC's Preemption Order which issued in those latter proceedings.

 In the Preemption Order the FCC noted that its prior conclusion in those proceedings had been that the expensing order in question "was not intended to preempt state commissions from utilizing other depreciation or accounting procedures for intrastate rate-making proceedings, unless such preemption occurs as a matter of law." *Preemption Order,* at 3 (Jan. 6, 1983). The FCC also noted its prior conclusion "that nothing in the history of Section 20(5) provided any indication of whether that provision had been intended to preempt state commissions from prescribing divergent depreciation rates when the Interstate Commerce Commission (ICC) had prescribed a rate." *Id.*

2. Title 28 U.S.C.A. § 2342(1) (1978) states in pertinent part that the Courts of Appeals have "exclusive jurisdiction" to review "all final orders of the Federal Communications Commission made reviewable by Section 402(a) of Title 47." Pursuant to the requirements of that statute and Section 402(a), questions as to the validity of the Preemption Order are not subject to review in the District Courts because they are final orders of the FCC. *See City of Rochester v. Bond,* 603 F.2d 927 (D.C.Cir.1979). The Preemption Order is currently in the process of review before the Fourth Circuit Court of Appeals in *Virginia State Corp. Comm'n v. Federal Communications Comm'n,* No. 83–1136 (4th Cir.). As of this date no decision has been rendered in those appellate proceedings.

3. The MPUC has stated in this proceeding in response to requests for admissions of fact that "the defendants [MPUC] admit that NARUC is a national organization within the membership of which are the various state public utility regulatory commissions as well as the Federal Communications Commission and various other state, federal and Canadian regulatory agencies. The defendants do not admit that NARUC serves as its agent or that at all times and in all circumstances NARUC represents the best interests of the Maine PUC, nor that it is its purpose to do so." Defendants' Responses to Plaintiff's First Request for Admission of Facts, Response No. 28. The Defendants also admit MPUC's awareness that NARUC and

30, and has not filed a motion to appear as *amicus curiae* in the proceedings on that appeal. *Id.,* Response No. 31.

On April 26, 1983, the MPUC issued its Decision and Order in *New England Telephone & Telegraph Co., Re: Proposed Increase in Rates,* No. 82–124 (April 26, 1983) (hereinafter cited as the "MPUC order").

The MPUC never undertook to challenge the Preemption Order either through direct-party status before the FCC or by participating in the appellate review of that Order in the Court of Appeals for the Fourth Circuit. Yet, in the rate-making proceedings involving NET, the MPUC declined to apply the RLDM prescribed by the FCC in its determination of NET's intrastate rates. Rather, the MPUC based its determination of NET's rates upon the WLDM, which is different from RLDM. MPUC Order at 37–39; Defendant's Responses to Plaintiff's First Request for Admission of Facts, No. 32, at 12. In considering NET's contention, the MPUC undertook a full review of the substantive propriety of the FCC's conclusions reached in both the Prescription Order and the Preemption Order. *See* MPUC Order at 30–40. As a result of analysis of issues already analyzed and decided by the FCC, the MPUC reached its own decision. It stated:

We conclude therefore that the FCC erred both in its conclusions of blanket preemption and preemption under federal supremacy, and therefore we do not consider the Maine Commission bound by the FCC's *January preemption Order* in setting depreciation rates for NET. We note also, as the FCC has, that depreciation and capital recovery are overlapping concepts. To the extent that depreciation is more rapid, capital recovery is quicker and more certain. Thus, the risks to investors are reduced. Our return on equity allowance in this case assumes that our depreciation practices are controlling. If different depreciation rates are used, our estimate of the risk to investors would vary as well. Consequent-

ly no change can be made to depreciation without a reappraisal of the allowed return on equity as well.

*Id.* at 36 (emphasis in original). The MPUC indicated its disagreement with the FCC position as set out in the Prescription and Preemption Orders by stating:

We are aware that three state commissions have been enjoined preliminarily from disregarding the FCC Order. While we will oppose any effort to obtain a similar injunction, we note that Maine law does not permit the Commission to resolve this matter by allowing rates under bond. Consequently, the course we are pursuing is the only way that we can protect Maine consumers from prolonged depreciation overcharges in the event that litigation against the FCC is ultimately successful.

*Id.* The MPUC's opinion did not consider methods to protect the utility's interests in the event that the litigation against the FCC would prove ultimately *un*successful.

In discussing NET's contention that RLDM should be employed, the Commission referred to its decision in *Continental Telephone Co. of Maine,* No. 81–61 (Dec. 23, 1981), in which it had expressed various reservations about the propriety of applying remaining life depreciation rates to Maine utilities. The Commission also found NET's analysis lacking in many respects:

[T]he core of NET's position appears to be that competition and technological advance have shortened service lives, and that as a result we should accept depreciation rates prescribed by the FCC to reflect this fact. The skeletal presentation, even though, as pointed out by NET in its reply brief, accompanied by expensive workpapers, does not address all relevant concerns.

MPUC Order at 38. The Commission noted that NET's only support for its position was a "bare calculation" made in rebuttal testimony as to the depreciation "that would be accrued using the whole life rates compared to the amounts that would be accrued as

---

other state regulatory commissions had intervened in the Fourth Circuit appellate proceed-

ings for review of the FCC's Preemption Order. *Id.,* No. 29.

using remaining life rates." *Id.* at 38. The Commission found that this type of analysis was "circular and does not really prove anything." *Id.*

The Commission disagreed with NET's assertion that it was generally known that service lives were in a period of shortening. The Commission appeared to adopt the Public Advocate's contention that even if service lives are shortening in locations other than Maine, that shortening may not be occurring within Maine because of a tendency to repair equipment that would be replaced in other jurisdictions. The Commission also noted that "[a] major further infirmity in the FCC position is that it bears no relation to depreciation as it actually occurs. Equipment does not depreciate uniformly across the country in either an economic or an engineering sense." *Id.* at 39. Finally, in respect to NET the Commission noted an additional factor militating against its adoption of Real Life Depreciation methods and rates:

> An additional consideration is the planned transfer of assets at net book value to AT & T on January 1, 1984. On such sale, NET will receive full capital recovery for assets transferred. Higher depreciation rates now would only result in a lower sale price for those assets. The exact effect of the sale on the proposed depreciation rates is not clear. NET states that $264,000 of the $1,707,-000 in increased intrastate depreciation expense due to the implementation of remaining life rates is attributable to terminal equipment accounts, which it claims would constitute the *bulk* of the assets to be transferred . . . However, as staff witness Selwyn points out, all depreciation accounts will be affected and the assets to be transferred comprise a substantial portion of NET's assets.

*Id.* at 39 (citations to evidentiary sources omitted; emphasis in original).

Thus, the Commission undertook its own substantive evaluation of the propriety of application of RLDM as opposed to WLDM. This evaluation was independent of and at variance with the evaluation and determination of that issue (and related issues) previously conducted by the FCC in both the Prescription and Preemption Orders.

NET has sought review of the MPUC Order before the Maine Supreme Judicial Court sitting as the Law Court in *New England Telephone & Telegraph Co. v. Public Utilities Commission,* No. KEN–83–1907, pursuant to 35 M.R.S.A. § 303 (1978). Plaintiff's Answers to Defendant's First Request for Admission of Facts, Response No. 9. Maine law specifically provides that during the pendency of such an appeal:

> no injunction shall issue suspending or staying any order of the commission and said appeal shall not excuse any person or corporation from complying with and obeying the order or decision or any requirement of any order or decision of the commission or operate in any manner to stay or postpone the enforcement thereof, except in such cases and upon such terms as *the commission* may order and direct.

35 M.R.S.A. § 304 (1978) (emphasis added). The quoted statutory restriction upon the Law Court's appellate jurisdiction appears to excise from its authority, in appeals from orders of the Public Utilities Commission, the more general equitable appellate jurisdiction with respect to stays and injunctions granted to the Law Court by 4 M.R.S.A. § 57 (Supp.1982–1983).

In its pending appeal to the Law Court, NET has not sought to raise for review any question as to the legality or propriety of MPUC's election to treat depreciation expense accrual on the basis of WLDM. NET presents that issue exclusively to this Court by the Complaint herein.

This Court finds that the rates established by the MPUC's Order of April 26, 1983, continue to prescribe utilization by NET of depreciation methods other than those prescribed by the FCC in the Preemption and Prescription Orders. The Commission has continued to retain the WLDM and rate structure for the determination of depreciation allowances and the recovery of depreciation in the form of expense accruals. The MPUC Order proscribes the adoption by NET of the FCC-mandated

method of Real Life Depreciation and corresponding rates. The MPUC Order clearly expresses the intent of the Commission to reach a conclusion markedly at variance with the one reached by the FCC in the Prescription and Preemption Orders. The use of WLDM and rates is inconsistent with the FCC-mandated RLDM and rates.

Under the MPUC depreciation method, when an asset is acquired, a fixed life is assigned to it and the costs of depreciation are allocated over the assigned period regardless of the actual life of the asset. Recovery of those costs occurs at a slow rate at the beginning of the life of the asset. On the other hand, the RLDM technique now prescribed by the FCC as a result of the Prescription and Preemption Orders evaluates the remaining life of assets at periodic temporal intervals, and the remaining value of an asset is depreciated over its remaining life, regardless of the length of the originally assigned service life of those assets. The RLDM is conceded to result in greater recovery of asset costs early in the life of the asset. The MPUC order makes it plain that the actual expenses of the Plaintiff, including costs associated with depreciation of assets, are among those factors evaluated by the MPUC in determining what rates NET will be allowed to charge. It is clear that if depreciation of NET's assets is computed according to the FCC-mandated method rather than according to the WLDM employed by the MPUC, NET's expenses will be substantially increased with resultant increases in revenues. The Court finds that the use of the FCC-mandated accounting procedures and depreciation methodologies would result in accelerated depreciation and currently greater expense accruals for depreciation which may require a related increase in rates in future MPUC rate proceedings.

A significant objective of depreciation accounting is to assure the integrity of a utility's capital investment in the plant and equipment by which it provides its public service. It attempts to do this by assuring that capital invested in the business is fully recovered over the useful life of the depreciable asset through charges to expense. In the WLDM the calculated depreciation rate is based on the average whole life of a complex of assets. Allowances of expense for depreciation are calculated by applying the depreciation rate to the investment in assets. Certain circumstances, such as the introduction of new technology, the pressure of competition, or unanticipated wear and tear on assets during normal use, cause a change in the estimated service life of the asset complex. Such circumstances create a need for adjustment in asset life if full recovery of capital investment in assets is to be recouped through depreciation. WLDM, however, does not permit such adjustments for subsequent changes in asset life. As a result that method generates either under-accruals or over-accruals of depreciation.

The RLDM provides for the making of such periodic reevaluations of asset life for purposes of calculating depreciation. That method takes into account the portion of the original investment that has been recovered through application of past depreciation rates and deducts that amount from the asset investment. RLDM is then calculated so that the unrecovered net investment remaining in the asset complex is charged to depreciation expense over the average remaining life of the asset complex. The RLDM has built into it a corrective technique for minimizing either under-accruals or over-accruals of depreciation, thus affording greater protection to the integrity of the invested capital by adjusting depreciation recoveries as expense accruals to take into account changes in asset life.

The MPUC's methodology for setting the currently effective rates of NET takes into account a calculation of the actual expenses of NET in accordance with standard regulatory accounting procedures. These expenses, including costs associated with depreciation of assets are a factor considered by MPUC in determining the rates to be set for NET's service. The effect of MPUC's use of WLDM and rates rather than the FCC-mandated RLDM and rates in calculating NET's intrastate rates is to reduce

NET's accrual of depreciation as business expense on an annual basis by approximately $1,667,000. This reduction of depreciation expense through reduction of annual accruals of depreciation as expense results in NET being deprived of approximately $800,000 per year of internally-generated cash which would result from the application of the RLDM as mandated by the FCC. The principal effect, however, is to also prevent NET from recovering those amounts of depreciation attributable to shortenings of asset life for which no adjustment is made on a periodic basis under WLDM.

The application of RLDM as opposed to WLDM over the remaining life of currently existing NET capital plant and equipment by the MPUC in setting NET's rates for service will ultimately deprive NET of approximately $20 million of capital asset value recapture through annual accruals of depreciation as expense. This is so because NET's depreciation expense by RLDM is substantially greater on an annualized basis than the depreciation expense when computed using WLDM. In order to replace the lost cash flow benefit of the increased depreciation expense that would be realized by NET, were it permitted to use RLDM, NET is required to generate *additional* annual revenues of $1,667,000 based on the test year used in the MPUC Order or to obtain approximately $800,000 of additional capital from external financial sources for which it must pay the costs associated with production of capital in that amount. NET is not compensated *at its current* rates as established by the MPUC for the additional costs associated with obtaining that additional capital. The Court finds that as a result of the foregoing considerations, NET is currently suffering a direct economic injury as a consequence of MPUC's utilization of WLDM as opposed to the FCC-prescribed RLDM.

Subsequent to the entry of the MPUC Order, the FCC denied a stay of its Preemption Order which was sought by a motion of the New York Public Service Commission and the National Association of Regulatory Utility Commissioners. *Amendment of Part 31, Uniform System of Accounts for Class A and Class B Telephone Companies,* No. 79–105, (July 22, 1983) (hereinafter cited as *Amendment to Part 31*). The FCC concluded that the grant of a stay would interfere with its competitive policies.[4]

Additional findings of fact are stated, as pertinent, in the course of the Court's discussion of its conclusions of law, *infra.*

### III. CONCLUSIONS OF LAW

The evidence and contentions of the parties in this case generate the following issues:

1. Whether, on the facts of this case, the Johnson Act, 28 U.S.C.A. § 1342 (1976), bars this Court from entering an injunction against the MPUC.

2. Whether FCC Preemption Order is enforceable under § 401(b):

 (a) Whether the MPUC is a "person" within the meaning of that term as used in § 401(b);

 (b) Whether the FCC intended the Preemption Order to be binding on all state regulatory bodies;

 (c) Whether the FCC Preemption Order is "regularly made" and "duly served" within the meaning of § 401(b);

 (d) Whether § 401(b) permits enforcement only against "persons" who are formal parties to the FCC proceedings resulting in such orders;

---

4. The FCC commented on this Court's earlier denial of the temporary restraining order in this case. It said:

 We believe the court's conclusion that the telephone company would not suffer irreparable injury was premised on an incorrect interpretation of tariff procedures. If the Commission's decision is upheld, the depreci-

ation expense recorded on the company's books for 1983 pursuant to this Commission's directive would not be recoverable through future tariff rates under the well established principle that past unrecovered expenses cannot be recovered prospectively. *Amendment of Part 31,* No. 79–105, at 4, n. 3 (July 22, 1983).

(e) Whether NET has demonstrated that it is sustaining harm as a result of the MPUC's continuing non-compliance with the Preemption Order.

### 1. The Johnson Act

The Johnson Act, 28 U.S.C.A. § 1342 (1976) provides as follows:

§ 1342. Rate orders of State agencies

The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:

(1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,

(2) The order does not interfere with interstate commerce; and,

(3) The order has been made after reasonable notice and hearing; and,

(4) A plain, speedy and efficient remedy may be had in the courts of such State.

The Congress enacted § 1342 to restrict the ambit of the power of the federal courts to enter injunctions against the orders of state regulatory commissions setting rates for the charges of public utilities. *Shrader v. Horten,* 471 F.Supp. 1236 (W.D.Va.1979), *aff'd,* 626 F.2d 1163 (4th Cir.1980). One purpose of the Act was to remove constitutional challenges to such orders from the federal courts, *Bridgeport Hydraulic Co. v. Council on Water Co. Lands,* 453 F.Supp. 942 (D.Conn.1977), *aff'd,* 439 U.S. 999, 99 S.Ct. 606, 58 L.Ed.2d 674 (1978), and to channel routine rate litigation into the state courts. *Shrader v. Horten,* 471 F.Supp. 1236. The evil addressed by this statute was that of the federal court's interference with the state's control of its own function of regulating public utility rates. *Tennyson v. Gas Service Co.,* 506 F.2d 1135 (10th Cir.1974). The statute's proscription of the exercise of federal jurisdiction to grant equitable remedial relief is intended to bar only those cases where claims to such relief are within the jurisdiction of the court sole-ly because of concepts of diversity of citizenship or repugnance to the Federal Constitution. *See International Brotherhood of Electrical Workers v. Public Service Commission,* 614 F.2d 206 (9th Cir.1980). In short, the statute proscribes federal court action in rate controversies which would have been, in the normal course, tried in state courts but which could be brought in federal court on the basis of diversity or federal question jurisdiction. In the absence of § 1342, these jurisdictional bases would operate to shift jurisdiction of such causes from the state to the federal courts.

Where the relief at issue is sought pursuant to another federal statute, however, the Johnson Act will not bar federal court jurisdiction. *Id.* In this case, the first requirement of the Johnson Act that must be satisfied in order to oust federal courts of jurisdiction in such cases cannot be met. NET invokes the jurisdiction of the court under 47 U.S.C. § 401(b) to obtain enforcement of an FCC Order. Section 401(b) of Title 47 United States Code provides as follows:

(b) If any person fails or neglects to obey any order of the Commission other than for the payment of money, while the same is in effect, the Commission or any party injured thereby, or the United States, by its Attorney General, may apply to the appropriate district court of the United States for the enforcement of such order. If, after hearing, that court determines that the order was regularly made and duly served, and that the person is in disobedience of the same, the court shall enforce obedience to such order by a writ of injunction or other proper process, mandatory or otherwise, to restrain such person or the officers, agents, or representatives of such person, from further disobedience of such order, or to enjoin upon it or them obedience to the same.

The central focus of this case is upon enforcement of the FCC's Prescription Order rather than upon the interference with the application of a state order affecting rates. This Court's jurisdiction over the

present action is therefore based specifically upon the particular grant of jurisdiction to the federal courts, set out in § 401(b), to "enforce obedience to such order by a writ of injunction or by other proper process, mandatory or otherwise," when the other requirements of that subsection are satisfied.

■ The use of the word "solely" in § 1342(1) permits the federal court to act where its jurisdiction is conferred independently of those jurisdictional bases enumerated in § 1342, *e.g.,* where the court's jurisdiction derives from a separate statutory grant of jurisdiction. The fact that an ancillary effect of the exercise of federal enforcement jurisdiction under § 401(b) may be an adverse impact upon the operation of "an order affecting rates" under § 1342 is not sufficient to invoke the bar of that provision. This is so because one of the specific conditions of the operation of that statute, namely, that jurisdiction be *solely* based upon diversity or constitutional repugnance, is not met. Therefore, the Johnson Act does not bar this court from entertaining this action. *Chesapeake & Potomac Telephone Co. v. Public Service Commission,* 560 F.Supp. 844 (D.Md.1983).

### 2. Jurisdiction Under 47 U.S.C. § 401(b)

#### (a) Whether the MPUC is a "Person" Under § 401(b)

The contention is made that § 401(b) does not confer upon this court jurisdiction over this case because the MPUC is not "a person" within the meaning of that term as used in the statute. The contention is explicitly put forth by the Public Service Board of the State of Vermont in its *amicus* brief and in the brief of the MPUC. The argument is succinctly stated in the Vermont *amicus* brief as follows:

> The statute provides for enforcement of FCC Orders against "persons" in "disobedience" thereof. In the first place, it is still another affront to logic to hold that anyone can be in disobedience of an order which does not—as the Second Preemption Order does not—command obedience but which merely declares an opin-

ion. Secondly, a state commission is not a "person" within the meaning of § 401(b). The Communications Act contains an explicit definition of the word, person, and that definition clearly does not include a state or a state agency. 47 U.S.C. Sec. 153i. [sic]. It includes only "an individual, partnership, association, joint-stock company, trust or corporation." Apart from the plain language of this provision, the legislature's intent to exclude state commissions from the definition of persons is made unmistakably clear by the fact that the statute contains a separate definition of state commissions. 47 U.S.C. Sec. 153t.

Brief of Public Service Board of State of Vermont as *amicus curiae* at 11.

A close reading of Section 153(i) and (t) of the Act reveals that the argument overstates the rigor of the definitional structure of the Act. Section 153 states generally that "for purposes of this chapter, *unless the context otherwise requires*" the following definitions apply. 47 U.S.C.A. § 153 (1962) (emphasis added). The stressed phrase makes it clear that the definitions set out in § 153 are not intended to be exclusive, exhaustive or comprehensive. Rather, they are "guideline" definitions whose scope and meaning are, as a general principle, to be varied as the context in which they are used in the Act may require in order to effectuate the congressional intent with which they are used. This view of the intended definitional flexibility contemplated by § 153 is confirmed by the language used to define statutory terms pertinent to the present issue, namely, "person" and "state commission." Section 153(i) states that " 'person' *includes* an individual, partnership, association, joint-stock company, trust or corporation" (emphasis added). The use of the term "includes" in the definition belies any congressional intent that the specifically enumerated entities are meant to reflect the exclusive content of the defined noun. To the contrary, the use of that verb clearly implies that other legal entities in addition to those enumerated in the definition may be within the scope of

the term "person." Further, the absence of any mandatory language in any of the definitions set out in § 153 cuts strongly against any assumption of legislative purpose to rigidly prescribe the exclusive content of the terms defined or to proscribe the application of the term "person" to other legal entities when, as the initiating *proviso* states "the context otherwise requires."

Further, § 153(t) states that " '[s]tate commission' means the commission, board, or official . . . which under the laws of any state has regulatory jurisdiction with respect to intrastate operation of carriers." 47 U.S.C.A. § 153(t). That language is clearly intended to articulate the identity of entities or persons who shall, for purposes of the Act, be considered to be a "state commission" within the intendment of the Act. It is a definition of *inclusion* rather than one of *exclusion*. It does not follow, especially in view of § 153's stated intent that definitions shall reflect contextual propriety, that *inclusion* of certain entities within the scope of "state commission" requires *exclusion* of a state commission from the meaning of "person" as set out in § 153(i). Clearly, where the context of the use of the word "person" requires that a state commission be considered a person, the section contemplates that that term has sufficient scope to embrace a state commission.

It is the obvious purpose of § 401 of the Act to provide procedural mechanisms for the enforcement of the provisions of the Act and of valid orders of the FCC as against those persons legally subject to them and the requirements they impose. Subsection 401(a) provides for district court jurisdiction to enforce, on application of the Attorney General, the provisions of Chapter 5 of the Act against "any person" who is in violation of the provisions of that chapter. Subsection 401(b) addresses generally the enforcement of "any order" of the FCC by providing for district court jurisdiction. It also authorizes the exercise of the district court's jurisdiction as against "any person." Finally, subsection 401(c) places upon the U.S. Attorney, on request of the FCC, the duty to institute and prosecute proceedings

necessary "for the enforcement of the provisions of this chapter and for the punishment *of all violations* thereof." 47 U.S.C.A. § 401(c) (Supp.1983) (emphasis added).

The statute may thus be seen to be intended to provide jurisdiction in the federal courts sufficient generally to enforce the provisions of statutory law and the requirements of FCC orders made pursuant to them. It intends enforcement to occur against "all persons" who are in violation of those provisions of law and the requirements of FCC orders. So general a concept of enforcement cannot logically admit of an exception based upon narrow and technical distinctions of status as to particular types of legal entities. The enforcement purpose of the Act cannot be realized with its intended generality unless "all persons," in that phrase's broadest ambit, found to be bound by the Act or order are subject to enforcement as prescribed by § 401(b). If any person or entity who is subject to and, therefore, obliged to obey the provisions of the law or the requirements of an FCC Order fails or refuses to do so, it is intended that the means to compel that person's obedience and compliance shall be available *via* the Act in the federal district court. Congress clearly intended that FCC Orders be enforced so long as they remain in effect. *Chesapeake and Potomac Telephone Co. v. Public Service Commission*, 560 F.Supp. 844 at 846, *quoting from Pacific Northwest Bell Telephone Co. v. Washington Utilities and Transportation Commission*, 565 F.Supp. 17, 20–21 (W.D.Wash.1983).

■ That being so, there is no basis to exclude from the definition of "any person" any entity that is legitimately subject to the compulsions imposed by the Act or FCC orders made pursuant to it. This is especially true of state regulatory bodies, *Chesapeake*, 560 F.Supp. at 847, which may be regularly expected to be subject to a greater incidence of required compliance with the Act and FCC orders than would most other categories of persons and entities except, possibly, regulated utilities.

■ It may be that in a particular case there is severe question as to whether a state regulatory body is in fact subject to an FCC order for any number of reasons or whether that order may be properly enforced against a state regulatory authority. There can be no doubt, however, that on a showing that such an entity is properly subject to the Act and FCC orders, Congress intended Section 401(b) to provide a jurisdictional basis in federal district courts for appropriate enforcement of the Act and FCC orders against that body, the other requirements of the subsection being met. That being so, this forum is available for a determination of the issue of whether or not the Act is enforceable against the regulatory authority in the face of any reasons that may be raised in defense of the proposition that the order is not so enforceable. Any effort to limit those entities subject to the jurisdiction of the District Court on the basis of entity type or status is analytically unacceptable as a premature and *sub rosa* decision of a separate and distinct inquiry; namely, whether or not the "person" before the Court is bound by the FCC order.

Congress could hardly have intended to allow a state commission to refuse the opportunity to seek review of a FCC Order and then to claim immunity from enforcement of the order on the grounds that it was not a "person" within the meaning of the enforcement section of the statute.

*Pacific Northwest Bell,* 565 F.Supp. at 21.

(b) *FCC Intent that the Preemption Order be Binding on All State Regulatory Bodies*

In this case this Court originally denied a Motion for a Temporary Restraining Order. *New England Telephone & Telegraph Co. v. Public Utilities Commission,* Civ. No. 83–0166P, slip op. at 7–16 (D.Me., June 15, 1983) (per Cyr, J.). Based upon the evidence presented to this Court on that motion, this Court found that the FCC's Order was intended to be preemptive of state orders but that the MPUC's "disobedience" of the Order did not subject it to enforcement under § 401(b). In recognition of this Court's findings, the District Court for the Middle District of Louisiana, in reconsidering its prior decision on the point, framed the issue of the preemptive intent of the FCC. It said, "the narrow issue then is whether this particular F.C.C. Order [the Preemption Order], by its terms, *requires* that all state regulatory bodies comply and adopt the F.C.C. accounting procedures." *South Central Bell Telephone Co. v. Louisiana Public Service Commission,* No. 83–557–A, slip op. at 6 (D.La., August 1, 1983) (emphasis added). Quoting portions of the language of ¶ 43 of the FCC's Preemption Order, the Louisiana Court concluded that the language could only be construed "as a direct order for the guidance of state commissions, specifically declaring that inconsistent state prescribed depreciation rates are void." *South Central Bell Telephone Co.,* No. 83–557–A at 7. There can, therefore, be no question at this juncture that the FCC intended its Preemption Order to be enforceable against *all* state regulatory bodies. The Court went on to note that:

[T]he order nevertheless is plainly directed to all state regulatory bodies and plainly declares that their depreciation procedures must comply with F.C.C. procedures. It is thus an "order of the Commission other than for the payment of money" and may be enforced under § 401(b) against any person who "fails or neglects to obey" by any party injured thereby.

*Id.*

This Court finds the above construction of the language of the Preemption Order in question persuasive *as to the intent of the Commission* in issuing the order. Any doubt as to the propriety of that construction is conclusively removed in this Court's opinion by action taken by the FCC since the time of writing of both Courts.

In *Amendment of Part 31,* discussed above at 12, the FCC denied a request for a stay of the Preemption Order as to state regulatory bodies, some of which were not formally before the Commission in the proceedings resulting in the Preemption Order. First of all, the fact that the FCC decided

to deny to a nonparty state regulatory body a stay of the Preemption Order clearly displays the accuracy of the Louisiana District Court's determination of the FCC's intent in issuing the Preemption Order; namely, that it should apply to *all* state regulatory bodies whether or not they were formally involved in the proceedings before the Commission which resulted in the issuance of the Preemption Order. The implication which results from the denial of a stay in those proceedings cannot be otherwise than that the FCC's original intent was that all state regulatory bodies be bound by the Preemption Order.

Furthermore, the language of the Opinion and Order denying the stay explicitly rejected the argument that a stay should be granted "because customers will suffer irreparable injury if increased rates resulting from the increased depreciation expenses are permitted to be included in the revenue requirements formula" currently being utilized by telephone utilities. *Amendment of Part 31,* ¶ 6, at 3. The FCC specifically noted that the rate payers' interest in this regard could be adequately protected by the state commissions' allowance of rate increases based upon the FCC-mandated depreciation method *subject to* a proper accounting order and refund procedure requiring that the additional revenues generated from rates based upon accelerated depreciation be refunded to customers in the event that the Preemption Order should be overturned on appeal. The FCC removed any doubt as to its intention that *all* state regulatory bodies should be bound by the Preemption Order on a current basis when it stated:

> The grant of a stay would interfere with our competitive policies. If a stay were to be granted, the capital recovery we found essential to the development of an efficiently functioning competitive marketplace would be halted. Moreover, there is no way that the carriers can retroactively recover the lost opportunity to recover the capital that would have been recovered in the absence of a stay if our decision is upheld on appeal... [I]f a competitive marketplace is to be achieved in the interstate jurisdiction, it is essential that the exchanges keep up to date with new technology in order to insure that customers will be able to avail themselves of the benefits of the evolving competitive offerings.

*Id.,* ¶¶ 7–8 at 4.

This articulation of the FCC's position is noteworthy in that it specifically expresses the FCC's intent as it is to be implied from its action in denying the stay; the original Preemption Order is intended to remain currently effective and binding upon all state regulatory bodies. It is of further significance in that it displays action by the FCC specifically rejecting one of the contentions urged in this case as a basis for denying enforcement of the Preemption Order under § 401(b); that is, that rate payers of telephone utilities will suffer irreparable injury if the FCC-mandated depreciation methodology is adopted. Finally, the FCC's articulation is significant in that it specifically adopts as a viable basis for denying the requested stay the proposition put forth by the Plaintiff in the present proceedings as a basis for obtaining enforcement of the Preemption Order under § 401(b); namely, that if the Preemption Order is not given current effect pending the determination of its legality on appeal by the Fourth Circuit Court of Appeals, the telephone utilities will lose irretrievably the "opportunity to recover the capital that would have been recovered in the absence of a stay if our decision is upheld on appeal." *Id.*

■ Accordingly, this Court concludes that there is no room to doubt that the FCC *intended* the Preemption Order to operate on all state regulatory bodies and to have the effect of preempting utilization by those bodies, in the regulation of intrastate rates, of any depreciation methodology at variance with that prescribed by the Prescription Order and that, in the words of the Preemption Order itself, such alternate methods and rates *are void.* Preemption Order, ¶ 43, at 16.

■ The rulings and orders of administrative agencies carry the full force of federal law and are accorded the same preemptive effect as federal statutes. *Fidelity Federal Savings & Loan Association v. de la Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). It remains to be considered whether the FCC's intent in this respect could legally be carried into effect under Section 401(b).

(c) *Whether the FCC Preemption Order is "Regularly Made and Duly Served" Within the Meaning of § 401(b)*

■ Section 401(b) of the Communications Act requires, *inter alia,* as a precondition to court enforcement of an FCC order that the court determine the order to be "regularly made and duly served." The Preemption Order meets this standard.

The history of the FCC's consideration of the matter of appropriate depreciation methods and rates has been detailed in Part II of this Opinion, the Findings of Fact. See text, *supra,* at 3–4, 12. All the proceedings discussed were preceded by proper Public Notice as required by 47 C.F.R. § 1.403. Although the record before the Court does not indicate that the MPUC participated in the first proceedings which resulted in orders allowing the RLDM and deciding that that method did not preempt state prescribed methods, MPUC does not contend that the orders made in the course of those proceedings were other than regularly made, and the FCC appears to have followed the usual rule making requirements set forth in 47 C.F.R. §§ 1.399–1.429.

Similarly, the Court is satisfied that the proceedings culminating in the issuance of the Preemption Order were properly treated by the FCC as rule making proceedings under 47 C.F.R. §§ 1.399–1.429. MPUC participated in the proceedings culminating in the Prescription Order but did not participate in those proceedings resulting in the Preemption Order by either seeking direct party status or joining the challenge to that Order on appeal. The court has had no instance pointed out to it, and can find none

on its own independent study, with respect to which it can be asserted that the proceedings were not conducted by the FCC in accordance with the applicable rules. The Preemption Order emanating from those proceedings must be considered therefore, as "regularly made" within the intendment of § 401(b). Finally, MPUC concedes that it was served with the Preemption Order and had knowledge of its content.

While not asserting any procedural irregularity in the making of the Preemption Order, MPUC does contend that it cannot be considered to be within the purview of a § 401(b) Order because it is not made in an "adjudicative" context in which the MPUC was a party. This contention does not address the issue of whether the Preemption Order was "regularly made" but goes, rather, to the question of whether it is the type of order contemplated by § 401(b) as ripe for enforcement under that statute.

(d) *Whether § 401(b) Permits Enforcement of an FCC Order Only Against "a Person" Who is a Formal Party to the FCC Proceedings Resulting in Such Order?*

This issue resolves itself into one of statutory construction. The key determination to be made is that of the meaning and scope of the word "order" as used in § 401(b).[5]

The position of the MPUC on this issue is based wholly upon its contention that § 401(b) does not contemplate enforcement of any "order" of the FCC except against *parties* who participate in the FCC proceedings from which the order to be enforced (here, the Preemption Order), results. The MPUC's core contention on this issue is set forth in its brief as; " . . . the view that 'order' as used in § 401(b) must mean an order in *an adjudicatory proceeding,* specifically mandating or prohibiting an act by a party to that proceeding. In other words, 'order' must be understood in the same sense that it is used in 5 U.S.C. § 551(6)."

---

**5.** For the text of 47 U.S.C.A. § 401(b) see text at 15–16.

MPUC brief, at 4.[6]

NET, on the other hand, contends that the definitional elements of the term "order" as it is used in § 401(b) are set out in the specific language of that section. These elements, it contends, are (1) that the agency action be an order of the agency; (2) that the order be "regularly made", (3) that the order be "duly served"; and (4) that it be "other than for the payment of money." NET's position, in essence, is that if the agency action sought to be enforced meets these criteria, specifically set out in § 401(b), that action is of the kind contemplated by the statute and is to be treated for § 401(b) purposes as an "order" contemplated by the statute. NET specifically asserts that there is no requirement that it be shown, to achieve enforcement of an agency action under § 401(b), that the defendant in the enforcement action was a formal party to the action before the administrative agency. All that is required to be shown is that the agency "regularly made" the order and that it was "duly served." NET brief, at 6–7.

This issue has been examined, with specific reference to this Preemption Order, on

two occasions; the first was this Court's "Order Denying Motion for Temporary Restraining Order" (per Cyr, J.) and the second was the "Order Amending Order for Preliminary Injunction" entered in the *South Central Bell* case. This court's discussion of the issue was in the context of determining NET's "likelihood of success on the merits" for purposes of deciding if a temporary restraining order should issue under F.R.Civ.P. 65(b).[7] The Court found the Preemption Order to be "a clear declaration of the FCC's position that federal law preempts all state depreciation rates which are inconsistent with the rules prescribed by the FCC." *New England Telephone & Telegraph Co. v. Public Utilities Comm'n.* slip op. at 7. Nevertheless, the Court concluded that the MPUC's "refusal to comply" with the Preemption Order did not constitute "disobedience of an order within the meaning of Section 401(b)." *Id.* at 8.[8]

That analysis did not dissuade the *South Central Bell* court, in its reconsideration of the issue, from the propriety of its prior course in granting the injunctive relief

**6.** The statutory reference is to the Federal Administrative Procedure Act, 5 U.S.C.A. §§ 500, *et seq.* (1977). Section 551 of the Act sets out definitions of terms used in the Act. Section 551(6) reads as follows: " '[O]rder' means the whole or a part of a final disposition whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing."

**7.** In the present posture of this matter, namely, on consideration of a request for a permanent injunction, NET's "likelihood of success on the merits" is not in issue. It is clear that this Court's prior determination of the issue as a predictive judgment at the TRO stage does not become the law of the case or otherwise bind the court at the stage of final adjudication of the merits of the claim for injunctive relief. *Berrigan v. Sigler,* 499 F.2d 514, 518 (D.C.Cir. 1974).

**8.** The Court's conclusion as set out in the text was based upon five considerations. These were: (1) the court's rejection under *Columbia Broadcasting Systems, Inc. v. United States,* 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942) of NET's broadest argument that all "FCC pronouncements, including rules, regula-

tions and adjudicatory orders" are enforceable as "orders" under § 401(b), *New England Tel. & Tel. Co. v. Public Utilities Comm'n,* Civ. No. 83–0166–P, slip op. at 8 (D.Me. June 15, 1983); (2) case law under § 401(b) indicating that the section did not create "new, private rights," *id.* at 9, "does not empower private enforcement," *id.* at 10, and did not create "implied private rights of action" for either damages or injunctive relief, *id.* at 9–10; (3) the Court's conclusion that the FCC's labeling of its pronouncement as an "Order" is not controlling and that the substance of the FCC action is decisive in determining its status for enforcement purposes under § 401(b), *id.* at 11; (4) the Court's conclusion that the FCC's requirement that the order be served upon all state commissions does not necessarily display an FCC intent that nonparty regulatory agencies should be bound by the Preemption Order, *id.;* (5) the Court's conclusion that the case law and the distinction between adjudicatory orders and rules and regulations under pertinent provisions of the Administrative Procedure Act and under the Interstate Commerce Act, 49 U.S.C. § 16(12) supports a conclusion that "order" as used in § 401(b) was intended to mean a pronouncement that was "directive" in character. *Id.* at 12–15.

there sought. The court observed that, "[n]o one disputes that this is a final order of the FCC—the issue is whether it may be enforced by a private party under § 401(b) against the Public Service Commission." *South Central Bell Telephone Co. v. Louisiana Public Service Commission,* slip op. at 5. The court said the narrow issue was "whether this particular F.C.C. Order, by its terms, requires that all regulatory bodies comply and adopt the F.C.C. accounting procedures." *Id.* at 6. After a review of the content of the terms of the Preemption Order with special emphasis on the content of paragraph 43,[9] the court concluded that the order could only be seen "as a direct order for the guidance of state commissions, specifically declaring that inconsistent state prescribed depreciation rates are void." *Id.* at 7.[10]

■ This Court agrees with the characterization of the Preemption Order set out by the court in *South Central Bell.* It is not necessary to decide here the more general question of whether rules and regulations promulgated by the FCC without any specific directory intent, would be enforceable under § 401(b). That is not the issue presented by this case. What is at issue here is whether *this* Preemption Order is of sufficiently directory effect to be within the enforcement policy intended to be implemented by § 401(b), as long as other requirements specifically imposed by that section are met. This Court is persuaded that the question must be answered in the affirmative.

The Preemption Order is an FCC pronouncement undeniably intended by the FCC to bind all state regulatory agencies. The pronouncement itself is labeled as an "order." The pronouncement explicitly states "that this Commission's depreciation policies and rates ... preempt inconsistent state depreciation policies and rates." Preemption Order, ¶ 45, at 17. In it the FCC "find[s] it imperative to declare today that inconsistent state prescribed depreciation rates are preempted by the Communications Act *and are accordingly void.*" *Id.,* ¶ 43, at 16. Finally, in four *ordering* paragraphs the FCC *directs* that the Petition for Reconsideration be granted, that the Declaratory Ruling issue forthwith and that the order be published in the Federal Register and be served "on each state commission." As has previously been demonstrated, there can be no doubt but that the FCC intended for all state agencies to be bound by and to comply with the Preemption Order. See text, *supra,* at 20–24.

The very least that can be said of 47 U.S.C.A. § 401(b) is that Congress meant it to be available as a vehicle to enforce compliance with FCC Orders from those "persons" whom the FCC meant to be bound by them. Here, that is precisely what NET seeks. The factual allegations of the com-

---

**9.** Paragraph 43 of the Preemption Order sets out the reasons why the FCC concluded that a declaratory ruling was appropriate. It reads as follows:

In this case, it appears necessary to issue such a [declaratory] ruling to clarify for the state commissions and the carriers the effect of our depreciation prescriptions. The fact that reconsideration proceedings are under way in Ohio does not mitigate against such a course in light of the divergencies from this Commission's depreciation methods and rates that are occurring to the detriment of federal policies. Thus, we find it imperative to declare today that inconsistent state prescribed depreciation rates are preempted by the Communications Act *and are accordingly void.* The existence of a state statute preventing a state commission from adopting a particular method does not affect this determination. When federal preemption is in-

volved, there is no difference between a statute or a regulation of a state commission. *Both must fall in the face of overriding federal concerns and policies* (emphasis added).

**10.** The positive thrust of the FCC action is even more forcibly displayed in paragraph 45 of the Preemption Order in which the FCC states:

In light of the concerns expressed about an efficiently functioning market, we must find that inconsistent depreciation rates prescribed by state commissions will interfere with the efficient operation of the communications marketplace and thereby frustrate the achievement of the Commission's policies. Accordingly, we find that this Commission's depreciation policies and rates, including the expensing of inside wiring, preempt inconsistent state depreciation policies and rates.

plaint supporting that claim assert only the history of the agency action, the MPUC's failure to comply and the direct and immediate injury to NET which results from MPUC's failure to comply. The complaint seeks no damages. Its claim for relief is based upon no wrong other than MPUC's failure to comply with the Preemption Order. NET seeks no relief other than compliance with that Order. Finally, it seeks compliance from an entity whose compliance is plainly intended by the FCC. Thus, NET's whole claim, as set out in the complaint rests upon the existence of § 401(b) as a means of exacting simple, direct and immediate compliance from those who are intended to be bound by a regularly made order of the FCC.

■ Section 401(b) is meant to be a means to exact simple, direct compliance with an FCC order from an entity clearly meant by the FCC to be bound by it *provided* that the order was "regularly made" and "duly served." The statute provides that "any *party* injured" by the failure or neglect of "any person" to obey "*any* order"

of the FCC "other than for the payment of money" while the order "is in effect . . . may apply to the appropriate district court of the United States for the enforcement of *such* order." 47 U.S.C.A. § 401(b) (emphasis added). The statute goes on to provide that if the court finds the aforesaid circumstances to exist, "it *shall* enforce obedience to such order" by any of the various procedural modalities enumerated in the statute, including "a writ of injunction." 47 U.S. C.A. § 401(b) (emphasis added). The clear thrust of the statutory language is that the district court *shall* grant enforcement of an FCC order to any party to the FCC proceedings where that party shows that an FCC order regularly made and duly served is in effect binding any person who has refused to comply with it, thereby occasioning injury to the party seeking enforcement. The relief afforded by the statute is clearly parallel with the relief sought by NET.

No complexity of analysis nor refinement of definitional meanings can diminish the clarity or compulsion of the statutory statement.[11] Nor can this Court find any cases

11. It is significant that § 401(b) requires by its own terms that an order be "duly served" before enforcement of it may be had under the statute. This is obviously intended as a procedural safeguard against "a person" being subjected to enforcement proceedings on an order without first having been apprised of the existence and terms of the order to be enforced. Such a safeguard is unlikely to be necessary if the statutory intent is, as is contended by MPUC, that the statute would be available to enforce only orders of an adjudicatory type. Such orders would, in the normal course, result from adjudicatory or adversary proceedings in which the parties would be actively involved and participating. In such proceedings such parties would routinely receive notice of the order of adjudication *as the result of procedures in those proceedings.* Generally, no independent requirement of service of the order would be required. There arises a significant danger of enforcement of FCC Orders against "persons" who lack prior knowledge of the order to be enforced only if it is contemplated that § 401(b) reaches beyond purely adjudicatory orders and encompasses orders of the declaratory or rule making type.

That such was the underlying statutory intent in the framing of § 401(b) is further buttressed by the discrete choice of subjective nouns utilized in the statute. The statute states that the entity which may seek enforce-

ment of an order under the statute is "any *party* injured [by noncompliance with the order]." 47 U.S.C.A. § 401(b) (emphasis added). This can only be intended to mean a "party" to the proceeding before the FCC which results in the order as to which enforcement is sought. Yet, the statute states that enforcement of an order may be granted against "any *person* [who] fails or neglects to obey any order . . . ." 47 U.S.C.A. § 401(b) (emphasis added). The noun "person" is clearly one of greater scope and inclusiveness than the noun "party." If the Congress had intended § 401(b) to apply only to orders of the adjudicatory type, the noun "party" would also have been the appropriate word to use to describe the entity against whom enforcement could be sought. The use, instead, of the more general noun "person" must be taken to reflect a deliberate distinction between those entities which could seek enforcement and those against whom enforcement could be sought.

That distinction is germane only if "order" as used in the statute was not intended to be restricted in its meaning to orders of the adjudicatory type. This more comprehensive meaning of the word "order" is entirely consistent with the definition of the term set out in the Administrative Procedure Act, 5 U.S.C.A. § 551(6), on which MPUC relies. *See* n. 6, *supra.* That definition clearly permits "order"

that indicate that the statute should be construed otherwise where the only relief sought is compliance with an "order" meeting the requirements of the statute. The cases which have been variously relied on to defeat enforcement of the Preemption Order, by establishing that § 401 does not create any private enforcement rights with respect to FCC orders, are simply not factually appropriate to a situation where simple compliance is the only relief sought from the federal court. In all of those cases relief was sought that went beyond simple compliance with the order; rather, what was in issue in those cases was the availability under the statute of some form of relief different than, and claimed to be derivative from, simple *compliance* with the FCC order.[12] The statute expressly pro-

to encompass orders other than those of the adjudicatory type and specifically applies the term to those that are "declaratory in form . . . other than rule making but including licensing." 5 U.S.C.A. § 551(6). That definition appears to be one of intermediate scope, being more expansive than orders of the adjudicatory type but less expansive than the more general meaning attributed to the term, in the view of this Court, as it is used in § 401(b). Of course, the Congress was not required to use the term in § 401(b) in the precise manner that it is used in the Administrative Procedure Act. The Court has been shown no persuasive reason why Congress would have intended to do so.

**12.** In the case of *Scripps-Howard Radio, Inc. v. Federal Communications Commission,* 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229 (1942), the Court had before it a certified question as to whether the Court of Appeals had the power to stay an FCC Order during the pendency of an appeal of the Order under § 402(b) of the Communications Act of 1934, 48 Stat. 1064, 1093. The Court there stated as *dictum* that "[t]he Communications Act of 1934 did not create new private rights." *Id.* at 14. The issue there was not one of enforcement of an FCC Order by mandate of the court. It was, rather, whether the parties appellant could obtain relief independent of the Order itself by invoking the equitable jurisdiction of the Court of Appeals. If the appellant could do so, it would receive not that which the FCC had ordered but relief *from* the duty of compliance with the FCC Order. The Court found the stay on appeal to be authorized because the historic power of the court to enter a stay on appeal had not been taken away by the Act. *Id.* at 16–17. As the Court pointed out, the case is narrowly limited: "We merely recognize the existence of the power to grant a stay." *Id.* at 17. It does not speak at all to the question of the scope of the court's authority to enforce an FCC Order under a specific statutory grant of authority to do so.

In *Lechtner v. Brownyard,* 679 F.2d 322 (3d Cir.1982) the plaintiff had brought an action to recover damages for violation of the FCC Personal Attack Rule, 47 C.F.R. § 73.1920. He also asserted a pendent claim for defamation and slander under state law. The defendant's claim on appeal that the Attack Rule did not create a private federal right to damages was sustained. The Court observed that the Attack Rule was an administrative rule that was regulatory and not remedial in nature and created no private right to damages for its violation. It is apparent that the relief sought by the plaintiff was different in kind than simple enforcement of (e.g., securing compliance with) the Attack Rule. On the facts there in question, the plaintiff could not secure compliance with the Attack Rule because the violation had already occurred. The Court could not have mandated compliance as to those past acts. What the plaintiff sought was a present remedy in damages derived from *the fact of* the past violation of the Attack Rule. That is markedly different from a request to require current compliance with the rule in broadcasting conduct. The latter relief would involve simple enforcement.

*Schnapper v. Foley,* 667 F.2d 102 (D.C.Cir. 1981), *cert. denied,* 455 U.S. 948, 102 S.Ct. 1448, 71 L.Ed.2d 661 (1982) has only the most tenuous relevance to the Communications Act and none whatever to the enforcement of FCC Orders. The complaint in that case challenged the legality of the arrangements among certain entities of the federal government and public broadcasting stations and networks for the broadcasting of certain films. The central attack was upon a provision of these arrangements which required the stations/networks to copyright the films and assign the copyright to the government. The claim was that damage occurred to members of the viewing public not within range of a public broadcasting facility because the arrangements prohibited commercial broadcast of the copyrighted films. The case was actually resolved on First Amendment considerations and principles of copyright law. Apparently, in passing, the plaintiff asserted that enforcement of the ban on commercial broadcast and enforcement of the copyright would violate policies implemented by the Public Broadcasting Act. 47 U.S.C.A. §§ 396, *et seq.* (Supp.1983). The opinion does not reflect that violation of any administrative rule or regulation under either that Act or the Communications Act was asserted to have occurred. In that context, the Court cursorily dismissed plaintiff's contention with the observation that the Act "provides no private right of action that is available to appellants." *Schnapper,* at 116.

vides only for enforcement to achieve *compliance.* Thus, it may be entirely appropriate to hold that the statute is not sufficiently broad in purposive scope to authorize any relief other than simple compliance.

That limiting proposition, assuming it to be correct, does not mean, however, that the directory thrust of the statute (e.g., "The court *shall* enforce obedience") is at all diminished where only simple compliance is sought by a party who satisfies all the requirements of the statute. Numerous courts have so applied the statute. *Chesapeake and Potomac Telephone Company of Maryland v. Public Service Commission,* 560 F.Supp. 844 (D.C.Md.1983); *Pacific Northwest Bell Telephone Co. v. Washington Utilities and Transportation Commission,* 565 F.Supp. 17 (W.D.Wash.1983); *South*

*Central Bell Telephone Co. v. Louisiana Public Service Commission,* No. 83–557–A (M.D.La. June 27, 1983); *amended* (August 1, 1983); *Southwestern Bell Telephone Co. v. State Corp. Commission of Kansas,* No. 83–4090, (D.Kan. April 8, 1983); *Brookhaven Cable TV, Inc. v. Kelly,* 428 F.Supp. 1216, 1221, n. 20 (N.D.N.Y.1977), *aff'd* 573 F.2d 765 (2d Cir.1978), *cert. denied* 441 U.S. 904, 99 S.Ct. 1991, 60 L.Ed.2d 372 (1978); *North Carolina Utilities Commission v. Federal Communications Commission,* 537 F.2d 787, 790–91, n. 2·(4th Cir.1976). Such application appears to this Court to have the sanction in principle of the United States Supreme Court in its application of parallel provisions of the Communications Act, 47 U.S.C.A. §§ 151, *et seq.,* in *Ambassador, Inc. v. Federal Communications Commis-*

In *Network Project v. Corporation for Public Broadcasting,* 561 F.2d 963 (D.C.Cir.1977), plaintiff sought injunctive relief to prohibit interference with an asserted right to view uncensored public television programs and also damages for injury to the professional reputations and abilities of certain plaintiffs to market their work products for broadcast. *Id.* at 966. These claims were based in part upon "various provisions of the Public Broadcasting Act of 1967." *Id.* at 972. Thus, the relief sought was derivative from an existing duty of compliance with the Act and was not at all dependent upon the force of any action of any administrative agency. No claim was made for compliance with any specific order. With the case so postured, it seems that the Court appropriately observed that "the Act does not explicitly authorize suits to enforce its provisions," *id.,* and concluded that a private right of action should not be implied from the Act's provisions.

In *Comtronics, Inc. v. Puerto Rico Tel. Co.,* 409 F.Supp. 800 (D.P.R.1975), the issue was the existence of a basis for federal question jurisdiction in an action for damages and injunctive relief against a utility under 42 U.S.C.A. § 1983. The claims asserted were based on allegations that the utility injured the plaintiff, a telephone equipment supplier, by refusing to permit the plaintiff's customers (subscribers to the utility service) to connect plaintiff's equipment to the utility's service lines and facilities. That conduct was alleged to be in violation of "the applicable Federal Communications Commission's holdings, rulings and policies pertaining to interconnection of customer owned telephone terminal equipment." *Id.* at 804–5. In seeking to determine if the § 1983 action had any foundation in an enforceable federal right under the provisions of the Communications Act, the Court acknowledged that rights of

action could be inferred from statutorily granted rights, *id.* at 813, but concluded that the right sought to be enforced was not available to the plaintiff because of the fact that the damage alleged did not occur to the plaintiff as a subscriber of the utility and because the utility occupied the status of a *connecting* carrier (as opposed to a *common* carrier). Thus, the holding of the case is not that FCC orders cannot be privately enforced but, rather, that the claim asserted in that case did not derive from any order that was binding upon the utility and that the plaintiff had no standing to enforce compliance with such order even if it did so. The decision *stands for the proposition that, on the* particular facts, no order of the FCC *was enforceable* by its own terms against the utility which supported the claim asserted in the § 1983 action.

The case of *Kroeger v. Stahl,* 148 F.Supp. 403 (D.N.J.1957) involves the attempted enforcement of an FCC permit against one not intended by the FCC to be under a duty of compliance. There the holder of "a special temporary authorization" from the FCC to conduct certain tests having to do with station interference, sought an injunction against a municipal building inspector prohibiting enforcement of a local ordinance in such manner as to prevent construction of a tower needed by the plaintiff in order to conduct the authorized tests. The court concluded that the temporary authorization issued by the FCC was not an "order" because "[i]t simply granted a request of the plaintiff that he be permitted to conduct certain tests, under limited conditions expressed therein." *Id.* at 406. The gist of the holding is that the authorization was not, by *any* construction, an order. It *required* nothing to be done. There was no obligation of compliance created by it.

*sion,* 325 U.S. 317, 65 S.Ct. 1151, 89 L.Ed. 1637 (1945).

Accordingly, this Court concludes that NET was "a party" to the FCC proceeding resulting in the Preemption Order;[13] that the MPUC is "a person" bound by the Order; that the Order was "regularly made and duly served," and that the Order is one subject to enforcement within the intendment of 47 U.S.C.A. § 401(b). Thus, NET is entitled to the injunctive relief it seeks if MPUC's non-compliance is causing injury, within the meaning of the statute, to NET.

(e) *Whether NET Has Demonstrated That It is Sustaining Harm as a Result of the MPUC's Continuing Noncompliance With The Preemption Order*

NET contends that it is entitled to injunctive relief upon a showing that MPUC has failed to obey the Preemption Order and that some injury is inflicted upon NET as a result of that disobedience. NET Brief, at 8. NET contends that injury does in fact result from MPUC's refusal to employ RLDM for rate making purposes because: (1) NET is denied current revenues necessary to offset current levels of allocated depreciation expense under RLDM, *id.* at 9; (2) it must increase its annual external

capital financing requirements by approximately $800,000 without current recovery of the cost of that additional financing, *id.* at 9–10; (3) it will not recover the full costs of existing capital assets over the period of life of those assets, thereby suffering a capital recovery shortfall of approximately $20,000,000 over the life of the present asset complex. *Id.*

MPUC makes multiple contentions on the injury issue. These are: (1) that even if RLDM is utilized, "perfect and instantaneous adjustments [of asset life] cannot in reality occur with respect to each of the company's assets, and the remaining life method does not insure in fact the perfect recovery that [NET's] hypothetical example might suggest." MPUC Brief, at 12; (2) that NET has not shown that even if such a difference in the rate of capital recovery does in fact occur, "any actual harm either to the company's investors or to the company itself" results from it, *id.* at 12–13; (3) that the depressive effect upon current cash flow occasioned by the use of WLDM and the additional cost of financing incident thereto do not result in injury to NET over the long term, *id.* at 16–21; and (4) that the use of WLDM has no long-term adverse impact on NET's earnings level. *Id.* at 21–22.[14]

**13.** The memorandum opinion and order in the reconsideration of the preemption issue released January 6, 1983 (the Preemption Order as to which enforcement is now sought) states that "the Commission has before it a Petition for Reconsideration filed on June 7, 1982, by the American Telephone and Telegraph Company, on behalf of itself and the associated Bell System operating companies (AT & T). *Preemption Order,* at 1. On the basis of this recital, NET was a "party" before the FCC in the proceedings resulting in that Preemption Order, as required by § 401(b) for enforcement purposes.

**14.** MPUC makes additional arguments urging that this Court deny NET's request for an injunction. First, the Commission asserts that the Court must weigh the equitable considerations before granting an injunction, and it suggests that the balance of those considerations favors a denial. MPUC Brief at 23–27. The Court remains unpersuaded that it is to exercise its equitable discretion. Section 401(b) specifically states that "[i]f after hearing, that court determines that the order was regularly

made and duly served, and that the person is in disobedience of the same, the court shall enforce obedience to such order by a writ of injunction or other proper process." This Court has made the necessary determinations. No further weighing of equitable considerations is required.

MPUC also suggests that the Court may consider the validity of the FCC's Preemption Order. *Id.,* at 27–30. While this Court may enforce that Order under § 401(b), the Court is satisfied that review of the validity of the Order is beyond the scope of its jurisdiction. See note 16, *infra.*

Finally, the MPUC argues that this Court should abstain from exercising jurisdiction in this case for reasons of comity and judicial economy. *Id.,* at 30–31. In making this argument, the Commission overlooks the fact that the Court is asked to act pursuant to a specific statutory grant mandating enforcement of FCC orders on the satisfaction of requirements set forth in the statute. The statutory responsibilities of this Court cannot be abnegated by re-

■ The purpose of the injury requirement in § 401(b) is two-fold: first, to avoid purposeless federal court interference in rate making disputes where no damage is done by disobedience of FCC orders; and second, to assure that where the effect of such disobedience is to deny an intended benefit of an FCC order, the party injured by the denial of that benefit shall have an effective avenue of redress in federal court to prevent the continuance of such injury. Thus, it is clear that if the person against whom enforcement is sought can show that its disobedience of the order does not deprive the party seeking enforcement of any benefit secured to it by the FCC order in question, the federal court may not interfere in the regulatory process by the exercise of its injunctive jurisdiction. The violation is, in practical terms, merely technical and no exigency exists sufficient to require taking the enforcement process out of the normal regulatory context. In such situation, the timing of effective enforcement is not a critical factor because no harm is done by the noncompliance.

On the other hand, it is equally clear that where it appears that a benefit intended to be conferred by the order is being denied to the party seeking enforcement of it, because of disobedience of the order, the factual dynamic takes on an additional dimension. The underlying rationale of the statutory grant of authority is that parties to FCC proceedings are entitled to current compliance with FCC orders regularly made and duly served from those persons intended by the FCC to obey those orders and that such parties should not be required to suffer an injury resulting from the current deprivation of the intended benefits because of unjustified disobedience. Where deprivation of the benefit of the orders to be enforced occurs, injury takes place. The existence of that injury justifies, as a matter of legislative policy judgment, the interposition of the authority of the federal court to alleviate that ongoing injury and to preserve the sanctity and force of regularly made orders. Seen in this context, the

§ 401(b) requirement of injury is merely a threshold requirement justifying the need for action by the federal court. The scope of injury, as the term injury is used in § 401(b), is to be measured by the nature and scope of the benefit meant to be conferred by the particular order sought to be enforced. Thus, the determination of the characteristics of that benefit, within the intendment of the FCC in promulgating the particular order, becomes the critical factor in perceiving whether injury, within the meaning of the statute, results from disobedience of the order.

It is significant that the order as to which enforcement is sought is the Preemption Order. That Order has an element of impact that is not present in either Order No. 20188 or in the Prescription Order. Order No. 20188 simply *allowed* the utilization of RLDM, and the Prescription Order *prescribed* its use as a matter of FCC policy. The additional element imported into the FCC regulatory matrix by the Preemption Order is the general *compulsion* that RLDM be used to the exclusion of all other inconsistent methods and a specific invalidation of all other methods for purposes of the setting of rates to apply in either interstate or intrastate business activity of the utility.

The Preemption Order seeks, therefore, to assure that NET will not be exposed in any manner to utilization of a rate making formula based upon any method of depreciation determination and expense allowance that is inconsistent with RLDM. The benefit conferred by the Order's compulsion is simply that NET will not have to contend with efforts to use any inconsistent depreciation method.

The clear command of the Preemption Order is that NET shall have the *current,* that is, immediate and continuing, benefit of the more accurately computed, and also accelerated, recapture of capital asset value that is provided by the utilization of RLDM and rates. Those advantages were found by the FCC to be necessary to effectuate the policies which it sought to implement by the adoption of RLDM.

sort to principles of comity or judicial economy.

Depreciation is a significant portion of the revenue requirement of the regulated telephone companies. As such, it plays an important role in determining the price at which they offer their services. If competition is to be viable, it is necessary for prices to reflect depreciation expenses that are realistic for a competitive market. Absent such depreciation levels, improper signals will be provided to the market. Since most plant is used interchangeably to provide interstate and intrastate communication service, supply and demand is determined by the combination of imputs from service demand in both regulatory jurisdictions. Approximately 75% of exchange plant is allocated to the intrastate jurisdiction. It is clear that unless telephone plant, including that portion subject to allocation to the intrastate jurisdiction, is depreciated at a reasonable rate, improperly timed capital recovery will occur. Indeed, in an increasingly competitive environment, it is possible that improper capital recovery could delay or prevent modernization which would add to the cost borne by rate payers and would and could, ultimately, threaten carriers' ability to fully recover their invested capital.

*Preemption Order,* ¶ 37, at 14. The reason underlying the need for more prompt and adequate capital recovery was specifically stated by the FCC:

The provision for adequate capital recovery is important to "make available, so far as possible, to all the people of the United States a rapid, efficient, Nationwide, [sic] world-wide wire and radio communication service with adequate facilities at reasonable charges. . . ." 47 U.S.C. 151. State depreciation rate prescriptions that do not adequately provide for capital recovery in the competitive environment, which constitutes this Commission's policy in those markets found capable of supporting competition, would frustrate the accomplishment of that poli-

cy and are preemptable by this Commission.

*Id.,* ¶ 33, at 13. It was explicitly found by the FCC that the use of competing depreciation methodologies by state regulatory bodies that were inconsistent with RLDM would have a harmful effect upon the effective achievement of the FCC's policy goals:

Moreover, the extent of state action attempting to prevent carriers from utilizing our depreciation prescriptions places substantial burdens on carriers and could well impair their ability to raise the investment capital they will need to fully compete in the continually evolving competitive telecommunications marketplace. Such a result could undermine the achievement of the Commission's objective to develop policies that will engender a dynamic, efficient telecommunications marketplace with services being provided at reasonable prices.

*Id.,* ¶ 37, at 14–15 (footnote omitted). Hence, said the FCC: "[t]he utilization of one depreciation rate is the most effective method for insuring that this uniformity will be maintained and to insure that no jurisdiction bears a greater burden than another in the transition to a fully competitive marketplace." *Id.,* ¶ 39, at 15. And again, "it is apparent to us that a substantial impact on federal policies could result if state commissions were allowed to diverge from Commission prescribed depreciation rates and practices. Accordingly, *it is essential to preempt inconsistent state depreciation practices* to avoid frustration of these vital national policies." *Id.,* ¶ 40, at 16 (emphasis added).

 The purpose of the Preemption Order was, therefore, to require exclusive use of RLDM for rate making purposes and to cut off any interference with its immediate and continuing adoption and utilization. That was the benefit the FCC sought to confer on NET and all other telephone utilities by its holding in the Preemption Order.[15] It is precisely that benefit which

---

**15.** That the FCC sought to achieve that result to assure the effectiveness of its regulatory

policies was made clear in its Order denying the stay of the Preemption Order. In *Amend-*

NET has been, and continues to be, deprived of by MPUC's course of action in refusing to accord obedience to the Preemption Order. MPUC's disobedience of the order injures NET precisely because it takes from NET the central beneficial element sought by the FCC to be conferred by the order. That element is not the *level* or *amount of* capital asset recapture achieved per se by NET. It is, rather, the *timing* and *current applicable rate of* such recapture. The FCC intended for RLDM-based recapture to commence at once and to be on the accelerated basis provided by RLDM. By its course of disobedience of the Preemption Order, the MPUC has delayed the commencement of RLDM-based asset recapture from January 6, 1983 (the date of the Preemption Order) to this date. During that time period NET has been deprived of the benefit of the accelerated recapture rate mandated by the FCC. In both respects NET has been injured by being deprived of intended benefits of the Preemption Order. That injury, which is found by the FCC to "undermine the achievement of the Commission's objective to develop policies that will engender a dynamic, efficient telecommunications marketplace with services being provided at reasonable prices," *id.,* ¶ 37, at 15, is sufficient to satisfy the injury requirement of § 401(b) and justifies the intervention of the federal court into the matrix of the regulatory pattern under that statute.

Because the critical element of the intended force of the FCC's action in the Preemption Order is temporal in nature and because that element is defeated by the delay in implementation of RLDM for NET which results from MPUC's disobedience of the order, the arguments advanced by MPUC are without merit to justify denial of the relief here sought by NET. First, MPUC contends that application of RLDM should not be required because it may not be a perfect method to recapture fully those portions of capital asset value that may be lost by shortening of asset life. That argument must fail for two reasons: (1) the ability to maximize the recovery of that portion of asset value is fully within the power of NET by its establishment of the

---

ment of *Part 31* the FCC based the stay upon its conclusion "that preemption was necessary in order to prevent the frustration of properly adopted federal policies in the regulation of interstate communications." *Amendment to Part 31,* ¶ 1, at 2. The FCC further stated that "[t]he grant of a stay would interfere with our competitive policies." *Id.,* ¶ 7, at 4. Obviously, the grant of a stay would permit disagreeing state regulatory agencies to adopt depreciation methods inconsistent with RLDM in the interim period between the issuance of the Preemption Order and the final decision on appeal from that Order. That is precisely what MPUC has sought to do during this same interim period. If the grant of the stay would frustrate the FCC's regulatory policies, so must the conduct in which the MPUC has engaged to date in disobeying the Preemption Order. It is that frustration of those policies that the Preemption Order was intended to prevent.

The policy reasons underlying the Preemption Order are clearly articulated by the language of the Order itself:

State depreciation rate prescriptions that do not adequately provide for capital recovery in the competitive environment which constitutes this Commission's policy in those markets found capable of supporting competition, would frustrate the accomplishment of that policy and are preemptable by this

....

...Moreover, the extent of state action attempting to prevent carriers from utilizing our depreciation prescriptions places substantial burdens on carriers and could well impair their ability to raise the investment capital they will need to fully compete in the continually evolving competitive telecommunications marketplace. Such a result would undermine the achievement of the Commission's objective to develop policies that will engender a dynamic, efficient telecommunications marketplace with services being provided at reasonable prices.

*Preemption Order,* ¶¶ 33, 37, at 13, 14–15. The FCC concluded that "[t]he utilization of one depreciation rate is the *most effective method* for insuring that this uniformity will be maintained and to insure that no jurisdiction bears a greater burden than another in the transition to a fully competitive marketplace," *id.,* ¶ 39, at 15 (emphasis added), and "that a substantial impact on federal policies could result if state commissions were allowed to diverge from Commission prescribed depreciation rates and practices." *Id.,* ¶ 40, at 15. Thus, the Order concludes on this point that "it is *essential* to preempt inconsistent state depreciation practices to avoid frustration of those *vital* national policies." *Id.* (emphasis added).

frequency of reassessment of asset life; and (2) even assuming the method does not assure perfect recapture, the FCC has determined that the difference in the efficacy of RLDM over that of WLDM is significant enough to justify the *immediate* utilization of RLDM in order to achieve current FCC policy goals. It is that determination that is conclusive upon both the MPUC and this Court.[16]

Secondly, MPUC contends that NET is not injured because even under WLDM NET will *eventually* achieve full asset recapture under the continued application of WLDM over the full period of life of the asset complex. That contention also fails for two[17] primary reasons. The first of these is that in order for WLDM to yield even eventually the full recapture of capital asset value affected by shortening of asset life, NET is dependent upon a series of exercises of the MPUC's discretionary authority to set rates in future years. There can be no assurance, whatever MPUC may now protest as a matter of theory, that the end result of the actual exercise of that authority in those future years will in fact yield full recovery of asset value. Yet, the FCC has decreed by the Preemption Order that as of January 6, 1983, NET is entitled to that benefit as a result of the use of RLDM. The acceptance of MPUC's argument would require the displacement of an FCC-conferred certainty with a state-proposed possibility which is beset with uncertainty and delay as to its actual materialization. Nor does that argument, if adopted, respond to the denial to NET of the FCC-mandated immediate and current accelerated recapture of asset life. NET has demonstrated herein, and the FCC has found, that the asset value recapture by expense allowance which is deferred in a current year is in the end denied. Expense accruals for depreciation denied in a current year cannot be made up in subsequent years under regulatory law. *Amendment of Part 31,* at 4, n. 3.

Likewise, MPUC's contention that no injury occurs to NET within § 401(b) because WLDM's depressive effect on cash flow occasions no injury in the long term, fails to address the injury done by denial of the temporal benefit of the Preemption Order.

Finally, MPUC's contention that NET may not succeed in this suit because it has not shown any harm done to its investors by MPUC's failure to render obedience to the Preemption Order misses entirely the thrust of the injury requirement of § 401(b). The statute confers the right to an enforcement action on a "party injured." 47 U.S.C.A. § 401(b). The party before the FCC in the preemption proceedings was the corporate entity, NET, as an associated Bell Systems operating company of AT & T. See note 13, *supra.* That entity, as the regulated utility, had the right to the benefit intended to be conferred by the Preemption Order. Therefore, upon its showing that *it* had been injured by a deprivation of the temporal benefit of immediate adoption of RLDM, the injury requirement of the statute is satisfied. NET is not required to demonstrate a particularized injury to constituent classes of interest holders in the corporate entity.

## IV. SUMMARY AND ORDER

For the foregoing reasons, this Court concludes that:

(1) The Court has jurisdiction to issue the injunction sought herein under 47 U.S.C.A. § 401(b);

(2) The Johnson Act, 28 U.S.C.A. § 1342, is not a bar to issuance of an injunction in this action;

---

**16.** As discussed in note 2, *supra,* the District Court has no jurisdiction to review the validity of final orders of the FCC. That power is vested by statute exclusively in the court of appeals. 28 U.S.C.A. § 2342(1) (1978). Therefore, this Court must accept the reasoning of the FCC and apply the Preemption Order.

**17.** This Court is not persuaded that MPUC's contention is correct. However, it is unnecessary to set out at length the Court's analysis of the error underlying that contention since, for reasons independent of its correctness, the contention does not address the issue raised in this case.

(3) The Plaintiff is entitled to a preliminary and permanent injunction and that a preliminary and permanent injunction should issue herein;

(4) Unless an injunction is issued, the Plaintiff will sustain irreparable harm since MPUC's disobedience of the Preemption Order deprives NET of the temporal benefit of immediate and continuing application of RLDM and causes nonrecoverable losses of current cash flow and of recapture of asset value affected by asset life shortening. Neither the Defendants nor this Court can authorize Plaintiff to recover retroactively any revenues lost during the pendency of appellate proceedings to determine the validity of the Preemption Order. The Plaintiff will suffer harm thereby within the meaning of 47 U.S.C.A. § 401(b);

(5) No harm will accrue to the other parties to this proceeding or to the Plaintiff's rate payers since the injunction herein will require Plaintiff to place the rates at issue in effect subject to refund to rate payers with interest in the event the January 6, 1983 Preemption Order in FCC Docket No. 79–105 is not upheld on appeal. Collection of rates subject to refund with interest is adequate security under F.R.Civ.P. Rule 65(c); and

(6) It is in the public interest of insuring compliance with the congressional mandate of developing nationwide uniformity in telecommunications policy to enforce a binding FCC order regarding depreciation rates and methodologies while it is in effect and that the Preemption Order is such a binding FCC order.

WHEREFORE, it is ORDERED that judgment be entered in favor of the Plaintiff, New England Telephone and Telegraph Company, on its claim for a preliminary and permanent injunction under 47 U.S.C.A. § 401(b) and enforcing the *Preemption Order* against the Defendants, Public Utilities Commission of Maine; Peter A. Bradford, Chairman; Cheryl Harrington, Commissioner; and Ralph H. Gelder, Commissioner; said injunction to be in the form and substance of Exhibit "A" hereto annexed.

## PRELIMINARY AND PERMANENT INJUNCTION

Plaintiff's Motion for Preliminary Injunction having come on for hearing and argument on August 15, 1983, and hearing on said Motion having been consolidated with the hearing on the merits of Plaintiff's complaint for a permanent injunction, pursuant to Fed.R.Civ.P. 65(a)(2), and the Court having this date made its Findings of Fact and Conclusions of Law,

IT IS HEREBY ORDERED, that the Defendants, and each of them, comply strictly with the FCC's orders in *Prescription of Revised Percentages of Depreciation,* No. 82–542 (December 14, 1982) ("*Prescription Order*"), and *Amendment of Part 31, Uniform System of Accounts for Class A and Class B Telephone Companies,* No. 79–105 (January 6, 1983) ("*Preemption Order*"), and implement the FCC-prescribed remaining life depreciation methodology and rates in setting the charges for Plaintiff's intrastate service. Compliance with this Preliminary and Permanent Injunction requires that Defendants: (1) obey the *Prescription* and *Preemption Orders;* (2) employ forthwith the FCC-prescribed remaining life depreciation methods and rates in setting Plaintiff's currently effective charges for service in Maine; (3) determine Plaintiff's increased Maine intrastate revenue requirement resulting from current implementation of such method and rates; and (4) place into effect within ten (10) days from the date of this Order schedules of rates sufficient to generate increased revenues as so determined for the test period used in *New England Tel. & Tel. Co., re: Proposed Increase in Rates,* No. 82–124 (Me.Pub.Util. Comm'n, April 26, 1982), resulting from implementation by Defendants of the remaining life depreciation rates.

All additional revenues collected by the Plaintiff as a result of implementation of the FCC-prescribed remaining life depreciation method and rates shall be collected by Plaintiff subject to being refunded to ratepayers, including those who terminate the receipt of service from the Plaintiff during

the period that this Injunction shall remain in force, with interest at a reasonable rate to be set by the Defendant Public Utilities Commission of Maine. Such refund shall occur in the event that the FCC *Preemption Order* is not sustained on appeal. The refund provision of this injunction obviates any need for security to be provided to Defendants under Fed.R.Civ.P. 65(c).

The Findings of Fact and Conclusions of Law supporting the issuance of this Injunction are set out in the Court's Findings of Fact, Conclusions of Law, Opinion and Order, which are filed herewith and which are incorporated herein.